### AT THE

## NOVEMBER SESSION 1870, IN BOSTON.

PRESENT:

Hon. REUBEN A. CHAPMAN, CHIEF JUSTICE.
Hon. HORACE GRAY, JR.,
Hon. JOHN WELLS,
Hon. JAMES D. COLT,        } JUSTICES.
Hon. SETH AMES,
Hon. MARCUS MORTON,

## SUFFOLK COUNTY.

### JOHN CAREW *vs.* ALEXANDER RUTHERFORD & others.

A conspiracy to obtain from a master mechanic, whose business requires the employment of workmen, money which he is under no legal liability to pay, by inducing or threatening to induce workmen to leave his employment, and deterring or threatening to deter others from entering it, so as to render him reasonably apprehensive that he cannot carry on business without making the payment, is illegal; and in an action of tort he may recover the sum so paid, and damages for the injury of his business by the acts of the conspirators; but whether he can recover back the sum paid, in an action of contract, as money had and received to his use, *quære*.

CONTRACT against Alexander Rutherford, Joseph Wagner, Edward Shea, William Cooney, and the "Journeymen Freestone Cutters' Association of Boston and vicinity, an unincorporated association composed of the defendants personally named

VOL. X.                1

and other persons to the plaintiff unknown," to recover back $500 as money had and received by the defendants to the plaintiff's use ; with the following alternative count in tort :

" And the plaintiff says he was carrying on the business of cutting freestone in said Boston, and employed a great many workmen, and had entered into contracts with builders to furnish them with such stone in large quantities ; and the defendants, conspiring and confederating together to oppress and extort money from the plaintiff, and pretending that the plaintiff had allowed some of the said builders, with whom he had made contracts as aforesaid, to withdraw from the plaintiff's shop a part of the work he had so contracted to do, and to procure the same to be done by other contractors out of the state, caused what they called a vote of the Journeymen Freestone Cutters' Association of Boston and vicinity (named as defendants in the writ) to be passed at a meeting of said association, and to be written out upon records of said association, to the effect that a fine of $500 was levied upon the plaintiff for allowing said builders to withdraw said work and procure it to be done out of the state, as aforesaid ; and the defendants caused said vote to be communicated and read to the plaintiff, and threatened the plaintiff that unless he paid to them said fine of $500 they would by the power of said association cause a great number of the workmen employed by the plaintiff as aforesaid to leave his premises ; and the plaintiff refused to pay said $500, and the defendants caused a great number, to wit, twelve, of the workmen employed by the plaintiff as aforesaid, to leave his service, and said workmen left his service solely for the reason that he refused to pay said $500 demanded of him as aforesaid, and at the instigation of the defendants ; and the defendants thereafter threatened the plaintiff that unless he paid to them said fine of $500 they would by the power of said association prevent the plaintiff from obtaining suitable workmen for the carrying on of his said business ; and the defendants did prevent the plaintiff from so doing, for a long time, and until the plaintiff paid to the defendants said fine of $500 on the 26th day of August 1868 ; and the plaintiff says the defendants extorted said sum of $500 from him by means of said threats, and that he

paid the same to the defendants by compulsion of the defendants, against his will, to avert the injury threatened to his business as aforesaid."

Service was made on the individual defendants, who appeared and answered that " they admit that it is true that there is an association called the Journeymen Freestone Cutters' Association of Boston and its vicinity, and that they are members of such association ; they allege that the plaintiff, at the time of making the payment set forth in his declaration, was also a member of said association ; they are ignorant whether the plaintiff paid the sum of $500 at the time alleged to said association, and leave him to prove the same, if competent ; they deny that the plaintiff paid the same to them, or either of them, personally ; they deny each and every other allegation than as above admit-ted, in the plaintiff's declaration contained ; and they further say that, if at the trial the plaintiff shall introduce evidence tending to show that he paid the sum of $500 to said association, then they aver that such payment was made by him to said association as an initiation fee into said association, and that he was present at the meeting at which the vote was passed fixing the initiation fee at such sum, and after such vote paid the same voluntarily to his own use as well as to others', and therefore is not entitled to maintain this action."

At the trial in the superior court, before *Brigham*, C. J., without a jury, the judge found these facts :

" The plaintiff in August 1868 was a freestone cutter at South Boston, and had contracted to furnish cut freestone for various buildings, among which was the Roman Catholic cathedral in Boston, in large quantity and at a contract price of $80,000. The defendants, and sixteen other persons, all journeymen free-stone cutters, and members of an unincorporated association called the Journeymen Freestone Cutters' Association of Boston, Charlestown, Roxbury, and their vicinities, (of which association the plaintiff was not a member,) together with eight or ten labor-ers, who were not journeymen stonecutters or skilled laborers, and four apprentices to the freestone cutting trade, constituted the stonecutting force relied upon by the plaintiff to fulfil his said

Carew *v.* Rutherford.

freestone contracts. [The constitution and by-laws of the association were put in evidence; and the material parts of them are printed in the margin.*] On the morning of August 18, 1868,

---

* The constitution consists of twenty-five articles, after the following preamble:

"Whereas in the course of human events civilization is spreading its salutary effect over the globe; and whereas societies and honorable combinations are marching hand in hand with enlightened bodies, and for their mutual support and protection certain classes of men in their respective callings do assemble and commune together, to adopt rules and regulations to govern their professions, and to develop and embrace the advantages that are derived from a thorough knowledge of business throughout this land; and whereas stonecutters heretofore, in this great and growing country, were looking on with calm indifference at the prosperity derived from such association, but have finally been awakened from their lethargy, and now behold with delight the solid advantages they may derive from a similar institution; they therefore have formed themselves unanimously into one body, to guard and cherish that trade which gives to them an honorable livelihood, and do adopt for their government the following constitution and by-laws, and to show to the world that they are alive to their moral as well as their pecuniary interest."

The first four articles define the name of the association, provide for the choice of officers, fix the times and manner of its monthly meetings, and limit membership of it to "practical journeymen freestone cutters."

The fifth, sixth and seventh articles provide that each member shall subscribe to the constitution, "and pay such moneys monthly, or other dues and contributions, as this association may, from time to time, resolve and declare;" that "the contributions of this association shall be twenty-five cents per month, which shall form a fund for the general purposes of the association;" and that no portion of the funds of this association shall be appropriated for any purpose except to promote the interests of the trade, nor shall any extra contributions be levied on the members, except by a two thirds vote of all the members present at a meeting called for that especial purpose."

Some of the remaining articles are as follows:

" 9. A committee shall be appointed whenever this association think proper, to wait on the employers concerning a rise and fall of wages.

" 10. The consent of two thirds of the members present at a meeting shall be requisite to decide on adopting measures to obtain higher wages, and the consent of a majority shall be requisite to adopt measures to oppose any, or the least reduction of wages in our trade.

" 11. Any employer who shall be known to depreciate our trade shall be firmly discountenanced by this association, and such measures shall be adopted towards him as are not inimical to the laws of this republic, nor to the rights of said employer as a citizen of this republic.

the defendant William Cooney, president of said association, who was foreman in the plaintiff's establishment, notified the plaintiff

"13. During meeting hours, and especially while at work, this association shall discountenance the least malicious spirit towards employers, except self-preservation should demand it, being fully sensible that in the prosperity of the employer the prosperity of the employed is founded.

"14. That no more than four apprentices be allowed to each firm, or shop, and that the overplus now in each shop be allowed to finish their time of service, and if any employer gives up business it will be legal for members to work with the apprentices of such boss or firm, wherever they shall be sent to finish their time.

"15. This association will not sanction any of its members working for any person who takes a sub-contract from a stonecutter, or a firm that carries on the stonecutting business.

"17. It shall be the sense of this association, that a strike should only be resorted to when all other means fail to effect a redress of grievances.

"20. Any member on strike, or losing time in consequence of conforming to the rules of this association, shall receive the sum of seven dollars (married men) and five dollars (single men) per week, for the time he or they may lose, except on a general strike, the money to be loaned to any member making application for it, and to be paid back when he or they go to work, as the association may direct.

"21. This association, knowing well the unwise and injurious effects of convict labor, as established in our midst in opposition to the honest mechanic, are unanimous in opposing to the utmost, as good citizens, that course which would force the honest workingman to a level with the convict. Therefore, this association will not sanction the introduction of cut stone from any state prison.

"24. If any member informs any person, not a member of this association, of any of its business, he shall pay an initiation fee of twenty-five dollars."

The following are some of the provisions of the by-laws:

"A committee of investigation shall be appointed by the president at each meeting, whose duty it shall be to inquire strictly into the character of all candidates for membership, and to ascertain that they conform in every respect with the qualifications necessary for admission, and report to the society, before any person can be admitted.

"Each member shall pay the sum of one dollar and twenty-five cents initiation fee, and twenty-five cents for his monthly dues, and such other contributions as may from time to time be resolved upon by this association.

"No man shall be received among us unless he can produce a certificate of recent membership of the association from whence he came, provided any such existed there.

"No member shall at any time fit or work, or in any way contribute towards the introduction of cut stone from the state prison of this or any other state.

that on the evening of the day before, at a special meeting of the association, it was voted that the plaintiff should pay to the association the sum of $500 as a penalty imposed upon him by the association because he had sent to New York to be executed some of the freestone cutting to be done under his contract for the ca-

"This association will not sanction any of its members taking any quantity of work more than one stone at a time, from any employer or firm carrying on the stonecutting business. And any member who shall be knowing to agree for more than one stone at a time by the piece shall forfeit all claim on the association, nor shall he again be admitted to membership without paying an initiation fee, subject to the decision of the association.

"This association will not allow any ornamental work of any kind to be taken from one yard to another, or to any other place, to be cut or finished, and it shall be the duty of all members of this association to aid, as far as it is in their power, the apprentices getting a practical knowledge of this class of work. Any member not conforming with this rule shall be dealt with as the association may think proper.

"When a strike is contemplated by any shop of men, either for an advance of wages, or to resist a reduction of wages, or for any other cause, notice shall be immediately given to the president, who shall convene a meeting to take the matter into consideration, and instruct the members.

"On the eve of a strike, a deputation shall be appointed immediately to wait on the employers for the purpose of endeavoring to come to an amicable adjustment of the differences existing between them, and report the result to the association.

"When a strike takes place in any shop, it shall be the duty of the shop steward to take a list of the members who are on the strike, and call their names at an hour and place appointed for the same every morning. And every member neglecting to attend such meetings shall forfeit each day's strike pay that he is absent, unless an excuse be received for his absence.

"Any member hearing of measures injurious to the trade or association shall report the same at the next stated meeting.

"Any member who shall be found endeavoring to cause a division among us, in regard to forming another association in opposition to this, shall be denounced as a most inveterate scab, and his name shall be published through the Union.

"Any member who will at any time infringe upon, or openly, in defiance of our constitution and by-laws, work in any place styled by this association a scab-shop, or violate this constitution and by-laws, shall be denounced by us as an inveterate scab, and shall forfeit all claim to this association as a member, and before being admitted again as a member, he shall pay an initiation fee not exceeding $40, and not less than $15."

thedral; and upon the plaintiff's refusal to make such payment, all the journeymen freestone cutters employed by him (among them, the defendants) left the plaintiff's service in a body, agreeably to said vote and the rules of said association. At his request, the plaintiff was permitted to appear at a meeting of the association and explain the circumstances which induced him to send a part of the stonecutting work required for the cathedral to New York to be executed; and, after explaining that his action in that matter was because of his not having the proper stock for that part of the work when he could procure journeymen to work upon it, and when, having procured such stock, he could not procure a sufficient force of journeymen to work it, there was a motion made and debated in the association, that the previous vote, to the effect that members should withdraw from the plaintiff's service unless he paid $500 as aforesaid, should be reconsidered and rescinded; but the association refused to reconsider or rescind the vote. At this meeting, said vote was read to the plaintiff by the secretary of the association. On the same night or the next morning, the defendants Cooney and Shea, and others, told the plaintiff that all the association men in his shop would desert him at once unless he paid the $500, and that the association refused to rescind the vote. The plaintiff refused to pay, and all his men left his shop at once and in a body, under the lead of Cooney and Shea; and the plaintiff was without men for a week or ten days, and until after he had made the payment of $500 as hereinafter stated. Previously to the payment of the money, and after the men had left him, Cooney and others of the defendants told the plaintiff that neither these men, nor any association men, would be allowed to work in his shop, if he refused to pay the money demanded. In consequence of the withdrawal of the defendants and the other journeymen, the freestone cutting which the plaintiff had contracted to do was stopped, because it was impossible for the plaintiff to procure journeymen or other freestone cutters, who were not members of said association, and who had such skill as was required for the fulfilment of his contracts. Several days after the defendants and the other journeymen had withdrawn from the plaintiff's service, the plaintiff, induced by

the necessity of doing so to fulfil said contracts and continue his other stonecutting work, paid to the defendants, to the use of said association, the sum of $500, on August 26, 1868; and the defendants and other journeymen, who had withdrawn as aforesaid, returned to the service and employment of the plaintiff. Said payment was made by the plaintiff as follows: He first made a check payable to the order of the association. This the defendants Cooney and Wagner refused to take, on the ground that no one of those active in procuring it was willing to indorse it. The plaintiff then made a check payable to Wagner or bearer, and gave this check to Cooney, and he, Wagner and others went with the plaintiff to the bank, when the money was passed to Wagner's credit as treasurer of the association. No receipt was given to the plaintiff for this money."

The judge further found as a fact " that the money demanded of the plaintiff was demanded without right, and not under any contract or agreement between him and the defendants."

Upon these findings the judge ruled that the facts would not sustain the action, and ordered judgment for the defendants. The plaintiff alleged exceptions.

*E. F. Hodges & J. F. Barrett*, for the plaintiff.

*S. J. Thomas*, for the defendants.

CHAPMAN, C. J. The declaration contains a count in tort, and a count for money had and received. The count in tort alleges, in substance, that the plaintiff was engaged in carrying on the business of cutting freestone in Boston, and employed a great many workmen, and had entered into a contract with builders to furnish them with such stone in large quantities; and the defendants, conspiring and confederating together to oppress and extort money from him, and pretending that he had allowed some of said builders, with whom he had made contracts, to withdraw from his shop a part of the work he had contracted to do, and to procure the same to be done out of the state, caused a vote of the Journeymen Freestone Cutters' Association of Boston to be passed, to the effect that a fine of five hundred dollars was levied upon the plaintiff, and read the vote to him, and threatened him that unless he paid the fine they would, by the

power of the association, cause a great number of the workmen employed by him to leave his service ; that he refused to pay it, and the defendants caused twelve of his workmen to leave his service for that reason, at their instigation. They further threatened him that, unless he paid the fine, they would, by the power of the association, prevent him from obtaining suitable workmen for carrying on his business, and did so prevent him till he paid the fine, and thus extorted from him the sum of five hundred dollars.

Trial by jury was waived, and the facts found by the judge are reported. It appeared that the plaintiff had made a contract to furnish stone for the Roman Catholic cathedral in Boston, and had employed journeymen to do the work, and relied upon them to fulfil his contracts ; and the facts stated in the declaration were substantially proved. The plaintiff was not a member of the association. He had sent some of his work to be done in New York because he could not obtain a sufficient force to do it in Boston, and had not proper stock for the work. If the action can be maintained, it is on the ground that the defendants have done the acts alleged, in violation of the legal rights of the plaintiff.

By the Gen. Sts. *c.* 160, § 28, which is cited by the plaintiff's counsel, "whoever, either verbally or by a written or printed communication," "maliciously threatens an injury to the person or property of another, with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do any act against his will, shall be punished " as the section prescribes. As this is a penal statute, perhaps it does not extend to a threat to injure one's business by preventing people from assisting him to prosecute it, whereby he loses his profits and is compelled to pay a large sum of money to those who make the threat, though the threat is quite analogous to those specified in the statute, and may be not less injurious. We shall therefore consider, not whether the acts alleged and proved against the defendants were unlawful within the statute, but whether they were so at common law.

The constitution and by-laws of the Journeymen Freestone Cutters' Association, whose agents the defendants profess to have been, have been laid before us. We have not had occasion to examine them critically; for the doctrine stated in *Commonwealth* v. *Hunt*, 4 Met. 111, 129, is unquestionably correct, namely, that, when an association is formed for purposes actually innocent, and afterwards its powers are abused, by those who have the control and management of it, to purposes of oppression and injustice, it will be criminal in those who misuse it, but not in the other members of the association. Upon the same principle, if the wrongful acts done are tortious, whether criminal or not, the persons who are guilty of the tortious acts will be civilly liable to those whom they have injured. If the defendants have injured the plaintiff unlawfully, the articles of association cannot protect them, and it is immaterial whether persons who are not parties to the action are guilty.

The acts charged are alleged to have been done in pursuance of a conspiracy. On this point, if two or more persons combine to accomplish an unlawful purpose, or a purpose not unlawful by unlawful means, their conduct comes within the definition of a criminal conspiracy as stated in *Commonwealth* v. *Hunt*, cited above. If, in pursuance of such a conspiracy, they do an act injurious to any person, he may have an action against them to recover the damage they have done him.

One of the aims of the common law has always been to protect every person against the wrongful acts of every other person, whether committed alone or in combination with others; and it has provided an action for injuries done by disturbing a person in the enjoyment of any right. or privilege which he has. Many illustrations of this doctrine are given in Bac. Ab. Actions on the Case, F., among which are the following : " If A., being a mason, and using to sell stones, is possessed of a certain stone-pit, and B. intending to discredit it and deprive him of the profits of the said mine, imposes so great threats upon his workmen, and disturbs all comers, threatening to maim and vex them with suits if they buy any stones, so that some desist from working, and others from buying, A. shall have an action upon the case against B.,

for the profit of his mine is thereby impaired." So " if a man menaces my tenants at will of life and member, *per quod* they depart from their tenures, an action upon the case lies against him." " If a man discharges guns near my decoy-pond with design to damnify me by frightening away the wild fowl resorting thereto, and the wild fowl are thereby frightened away, and I am damnified, an action on the case lies against him." Slander as to one's profession or title is a wrong of a similar character.

The illustrations given in former times relate to such methods of doing injury to others as were then practised, and to the kinds of remedy then existing. But as new methods of doing injury to others are invented in modern times, the same principles must be applied to them, in order that peaceable citizens may be protected from being disturbed in the enjoyment of their rights and privileges; and existing forms of remedy must be used. Thus in the recent case of *Marsh* v. *Billings*, 7 Cush. 322, the plaintiff, being a hotel-keeper, had a badge on his coaches indicating the name of his hotel. The defendant adopted his badge, and used it fraudulently to entice customers away from his hotel, and was held liable to an action for the damage occasioned to the plaintiff thereby.

In the cases cited above, the injury was done by an individual; but there are other cases where an element of the tort is a conspiracy of two or more persons who combine together for the purpose of doing the wrong. Any person has a right to express in a reasonable manner approbation or disapprobation of an actor at a theatre. But if several persons combine together to ruin an actor, and hire persons to attend, and with hissing, groans and yells, compel him to desist, and prevent the manager from employing him, such conduct is actionable. *Gregory* v. *Brunswick*, 6 Man. & Gr. 205.

There are many cases where money has been wrongfully obtained by fraud, oppression or taking undue advantage of another, without doing him any other injury. This, being tortious, would sustain an action expressly alleging the tort. But an action for money had and received has been maintained in many cases where money has been received tortiously without any color of contract.

1 Chit. Pl. (6th ed.) 352. This class of cases is referred to, because they discuss the question what constitutes an unlawful obtaining of money, such as will subject the party obtaining it to an action for damages.

In *Shaw* v. *Woodcock*, 7 B. & C. 73, it is said that, if a party making a payment is obliged to pay the money in order to obtain possession of things to which he is entitled, the payment is not a voluntary, but a compulsory payment, and may be recovered back.

In *Morgan* v. *Palmer*, 4 D. & R. 283, Abbott, C. J., says that, in order to render a payment voluntary in the proper sense of the word, the parties concerned must stand upon equal terms; there must be no duress operating upon the one; there must be no oppression or fraud practised by the other.

In *Cadaval* v. *Collins*, 4 Ad. & El. 858, money was recovered back which was obtained by abuse of legal process.

In *Wakefield* v. *Newbon*, 6 Q. B. 276, money extorted from another by means of the wrongful detention of his goods was recovered back.

The same doctrine is well established in this country. In *Sortwell* v. *Horton*, 28 Verm. 373, the principle was stated to be, that money may be recovered back that had been paid in discharge of a claim which was fictitious and false, and known to be so by the party making the claim, and who induced the payment by menaces, duress or taking undue advantage of the other's situation. There are several cases where the action has been maintained to recover back money which was paid to procure a release of property which the defendant had detained illegally; and in some of them the principle is thoroughly discussed. *Chase* v. *Dwinal*, 7 Greenl. 134. *Harmony* v. *Bingham*, 2 Kernan, 99. *Maxwell* v. *Griswold*, 10 How. 242. *Cobb* v. *Charter*, 32 Conn. 358. In *James* v. *Roberts*, 18 Ohio, 548, the court enjoined a party from enforcing the collection of a note which he had induced the plaintiff to give by threats of a groundless prosecution. *Evans* v. *Huey*, 1 Bay, 13, was an action on a note. The plaintiff went to the defendant's house in the night, with a party of armed men, and insisted on the defendant's settling and giving him the note.

There was no threat or duress, but the court held that, as the circumstances were sufficient to awaken his apprehensions, it was not to be regarded as a voluntary payment.

In the two cases last cited, the principle was enforced by protecting the injured party against a suit.

The cases in regard to the recovery back of money which nas been wrongfully obtained are very numerous. Many of them are collected in the notes to *Marriot* v. *Hampton*, 2 Smith Lead. Cas. (6th Am. ed.) 453. There is a large class of cases in which it cannot be recovered back, like *Marriot* v. *Hampton*, and like *Benson* v. *Monroe*, 7 Cush. 125. In the latter case, the defendant had made a claim in good faith, under a statute which he believed to be valid. The plaintiff had preferred to settle and pay it, rather than litigate the matter further. It turned out, by the decision in a subsequent case, that if he had carried the case to the supreme court of the United States he would have prevailed on the ground that the statute was unconstitutional. But neither this, nor any of the other cases, gives any countenance to the idea that money can be obtained by fraud or oppression, and with knowledge that the claim is unfounded, without exposing the party obtaining it to an action.

Without undertaking to lay down a precise rule applicable to all cases, we think it clear that the principle which is established by all the authorities cited above, whether they are actions of tort for disturbing a man in the exercise of his rights and privileges, or to recover back money tortiously obtained, extends to a case like the present. We have no doubt that a conspiracy against a mechanic, who is under the necessity of employing workmen in order to carry on his business, to obtain a sum of money from him, which he is under no legal liability to pay, by inducing his workmen to leave him, and by deterring others from entering into his employment, or by threatening to do this, so that he is induced to pay the money demanded, under a reasonable apprehension that he cannot carry on his business without yielding to the illegal demand, is an illegal, if not a criminal, conspiracy; that the acts done under it are illegal; and that the money thus obtained may be recovered back. and. if the parties succeed in

injuring his business, they are liable to pay all the damage thus done to him. It is a species of annoyance and extortion which the common law has never tolerated.

This principle does not interfere with the freedom of business, but protects it. Every man has a right to determine what branch of business he will pursue, and to make his own contracts with whom he pleases and on the best terms he can. He may change from one occupation to another, and pursue as many different occupations as he pleases, and competition in business is lawful. He may refuse to deal with any man or class of men. And it is no crime for any number of persons, without an unlawful object in view, to associate themselves together and agree that they will not work for or deal with certain men or classes of men, or work under a certain price, or without certain conditions. *Commonwealth* v. *Hunt,* 4 Met. 111, cited above. *Boston Glass Manufactory* v. *Binney,* 4 Pick. 425. *Bowen* v. *Matheson,* 14 Allen, 499.

This freedom of labor and business has not always existed. When our ancestors came here, many branches of labor and business were hampered by legal restrictions created by English statutes; and it was a long time before the community fully understood the importance of freedom in this respect. Some of our early legislation is of this character. One of the colonial acts, entitled " An act against oppression," punished by fine and imprisonment such indisposed persons as may take the liberty to oppress and wrong their neighbors by taking excessive wages for their work, or unreasonable prices for merchandises or other necessary commodities as may pass from man to man. Anc. Chart. 172. Another required artificers, or handicraftmen meet to labor, to work by the day for their neighbors, in mowing, reaping of corn and the inning thereof. Ib. 210. Another act regulated the price of bread. Ib. 752. Some of our town records show that, under the power to make by-laws, the towns fixed the prices of labor, provisions and several articles of merchandise, as late as the time of the Revolutionary War. But experience and increasing intelligence led to the abolition of all such restrictions, and to the establishment of freedom for all branches of labor and

business ; and all persons who have been born and educated here, and are obliged to begin life without property, know that freedom to choose their own occupation and to make their own contracts not only elevates their condition, but secures to skill and industry and economy their appropriate advantages.

Freedom is the policy of this country. But freedom does not imply a right in one person, either alone or in combination with others, to disturb or annoy another, either directly or indirectly, in his lawful business or occupation, or to threaten him with annoyance or injury, for the sake of compelling him to buy his peace ; or, in the language of the statute cited above, "with intent to extort money or any pecuniary advantage whatever, or to compel him to do any act against his will." The acts alleged and proved in this case are peculiarly offensive to the free principles which prevail in this country ; and if such practices could enjoy impunity, they would tend to establish a tyranny of irresponsible persons over labor and mechanical business which would be extremely injurious to both. *Exceptions sustained.*

After this decision, the case was settled by the parties, without another trial.