## D. V. Purington, et al., v. George Hinchliff.

### Gen. No. 11,234.

1. CONSPIRACY—*when agreements are unlawful and constitute a.* A series of agreements is unlawful and constitutes a conspiracy whereby substantially all of the building contractors of a particular locality agree to buy brick exclusively from certain specified manufacturers and by which the latter agree to sell brick to such contractors and to no one else and by which all the bricklayers in such locality agree to handle and lay only brick of such manufacturers obtained through such contractors.

2. CONSPIRACY—*when party chargeable with actionable results of.* The unlawful act which results in actionable wrong, need not be directly performed by the defendant. It is enough if it was done by or through the other defendants who were parties to the combination, or by agents, in pursuance of the objects which the combination was endeavoring to and did attain, namely, a total or general restraint of trade.

3. VERDICT—*when excessive.* A verdict for $22,000 held excessive in an action for injury to the plaintiff's property and business through an unlawful conspiracy in restraint of trade.

Action on the case. Appeal from the Circuit Court of Cook County; the Hon. EDWARD P. VAIL, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1903. Affirmed upon *remittitur.* Opinion filed May 5, 1905. *Remittitur* filed and judgment affirmed May 9, 1905.

**Statement by the Court.** This is an action on the case brought by appellee against appellants, who are members of a voluntary association known as the Brick Manufacturers Association of Chicago, and against others who have not joined in this appeal.

The declaration alleges, among other things, that appellee

was a manufacturer and dealer in brick, owning a certain brick manufacturing plant at Hobart, Indiana, which had been acquired and equipped at a cost of $50,000; that for six years prior to the time when the cause of action arose, he was engaged in the manufacture of brick which he sold almost exclusively in Cook County, receiving large profits from such sales; that during that time the Chicago Masons & Builders Association, one of the defendants, was a corporation in Cook County, comprising among its members about two-thirds of all persons and firms then engaged in the business of constructing brick and mason work in said county, and in the purchase of brick used in said county, including among its members substantially all the responsible and reliable persons or firms engaged in such business in said county; that during that time the members of said association constructed ninety-five per cent. of the brick and mason work done in said county, and plaintiff made sales of substantially all of the bricks of his manufacture and all that could be manufactured at his said plant to members of said association, from which he derived a profit of $10,000 per year; that during this period there was in said county a voluntary organization of individuals known as the Brick Manufacturers Association of Chicago, comprising ninety-five per cent. of the manufacturers of brick in said county, who were dealers in and sellers of brick in said county, and that appellants were members of said association engaged in the business of manufacturing and selling brick; and that there was also in said Cook County a voluntary association known as the Bricklayers Union, comprising among its members ninety-eight per cent. of the competent brick layers of said county.

It is further averred that while the plaintiff was lawfully conducting his said business as a manufacturer and dealer in brick, the defendants (appellants herein), who are members of the Brick Manufacturers Association, wrongfully and unlawfully conspired and agreed among themselves and caused to be agreed by the Masons & Builders Association and its members, that the latter would not purchase,

nor be permitted to purchase, any brick to be used by them or any of them, from any person, firm or corporation, except from members of the Brick Manufacturers Association, who had subscribed to the rules and regulations of said Masons & Builders Association; that said last named association also agreed with the Bricklayers Union, comprising ninety-eight per cent. of the competent bricklayers of Chicago, that the members of the said union would not handle nor lay brick except for members of the Masons & Builders Association; that after the making of said agreements, alleged to be illegal and corrupt and made with the purpose of injuring the plaintiff, the defendants actively interfered with the business of the plaintiff, preventing him from selling his brick, procuring persons to go to his customers and represent to them and workmen employed to lay and work with brick manufactured by the plaintiff, that if they should respectively purchase or use said brick, they would be prevented from completing or proceeding with such work; that by wrongful and malicious threats and by imposing fines upon persons dealing in or using the plaintiff's brick, the defendants have prevented their being laid and used, and the plaintiff has thereby been wholly deprived of the sales of brick in said county, which he otherwise would have had, has been unable to dispose of and sell his brick in Cook County and has been deprived of large gains and profits.

It appears from the evidence that the negotiations between the Masons & Builders Association which led to the agreements complained of, began in December, 1897, with the appointment of a committee by the Brick Manufacturers Association which obtained the appointment of a committee of the Masons & Builders Association, and the two committees in conference formulated the agreement. This seems to have finally gone into effect prior to October 1, 1898. The resolution of the Masons & Builders Association adopted at the time of the appointment of its committee of conference, provided *inter alia*, that "Whereas the brick manufacturers now have an organization which

takes in all of the brick manufacturers of Cook County and
vicinity, and believing that it is established upon a sound
and practical basis, and believing the system will control
the price of brick in the future " and that an agreement
would " greatly benefit and advance the interests of the
Chicago Masons & Builders Association and will strengthen
the Brick Manufacturers Association as well," therefore
the committee be appointed, which was accordingly done.

Substantial provisions of the agreement thus made are,
that the members of the Masons & Builders Association
who sign the agreement, agree to buy sewer, hollow and
common brick only from such members of the Brick Man-
ufacturers Association as have signed the agreement and
are in good standing in said association; and the members
of the Brick Manufacturers Association who sign the agree-
ment agree to give to the members of the Masons & Build-
ers Association signing the agreement and in good stand-
ing, a trade discount from the trade price of one dollar a
thousand brick. On all brick sold to purchasers outside of
the Masons & Builders Association the Brick Manufac-
turers agree to pay into their treasury one dollar a thousand,
the fund thus created to be divided every six months equally,
one-half to their own members who have signed and are
faithful to the agreement, and the other half to the faithful
members of the Masons & Builders Association. There
are provisions for enforcing the terms of the agreement by
imposition of fines and penalties, and it was to take effect
on and after April 1, 1898, within the limits of Cook County
and north of the Joliet Branch of the Michigan Central
Railroad in Lake County, Indiana.

There is evidence tending to show that plaintiff was the
principal competitor in Cook County of the members of the
Brick Manufacturers Association, that his plant had a ca-
pacity of from 50,000 to 60,000 bricks a day or about
15,000,000 bricks per year, that it was well equipped with
machinery and " the clay was all right." It appears that
plaintiff was at one time a member of the Masons & Build-
ers Association and that he made efforts to secure admis-

sion to the Brick Manufacturers Association without suc-
cess.   These associations and associates, the Brick Manu-
facturers, the Masons & Builders and the Bricklayers
Union, employed business agents and secret service men,
whose business it was to see that the rules formulated to
make effective the agreement between them were observed
by their membership.   There is evidence tending to show
that after the agreement in question was in active force
and operation, the plaintiff's business began to be interfered
with by these agents and secret service men; that contrac-
tors and owners who were purchasing and using plaintiff's
brick were compelled to cease using them, that large orders
and sales were canceled, that one owner was compelled to
pay a fine to the Masons & Builders Association before
being permitted to complete with plaintiff's brick a build-
ing which was under way, that workmen were directed not
to lay plaintiff's brick because he was not in the combina-
tion, and there is evidence of particular cases in which such
interference occurred.   In one case where, as the evidence
tends to show, money had to be paid to the Masons & Build-
ers Association for the privilege of using plaintiff's brick to
complete a job then under way, in order to get the work
completed, the association afterward returned the money
when threatened with legal procedure.   Plaintiff testifies
that the result of the combination and consequent inter-
ference with his business was that his brick became "abso-
lutely worthless.   There wasn't hardly a man in Chicago
that would handle them.   The workmen all belonged to
the union practically, and the hod carriers would not
handle them or the bricklayers wouldn't lay them."   He
testifies that he was called on by the secretary of the Ma-
sons & Builders Association, who told plaintiff " that the
joint committee of the master masons and the brick manu-
facturers crowd had just had a joint session in the next room
adjoining my office and had directed him to inform me that
they requested me to sell no more brick in the city of Chi-
cago or Evanston.   I told him they must be wrong; that
it was equivalent to asking me to quit business.   He said,

'there is no mistake on my part; the committee have just adjourned, and the members are still in the next room.' I said 'Go right back and tell them they are a bigger lot of fools than I thought they were, and I make a similar request of them.'"

Appellee's claim for damages was for loss of profits in his business and for depreciation in value of the land and buildings constituting his plant at Hobart, Indiana, used in the manufacture of brick. The court instructed the jury to the effect that there was no evidence tending to show this plant was damaged or injured by the acts complained of, and that the jury must not consider any such element of damage in arriving at their verdict. It was and is claimed, however, that plaintiff did suffer damages which the court's instruction precluded the jury from considering, resulting from the loss of his plant sold under foreclosure proceedings and depreciated in value owing to inability to dispose of its product in consequence of the conspiracy and combination complained of.

The evidence was submitted to a jury. A verdict was returned finding defendants guilty and assessing the plaintiff's damages at $22,000. A motion for a new trial was overruled and judgment entered upon the verdict. Errors are assigned on the part of defendants, who were members of the Brick Manufacturers Association. The other defendants do not join in the appeal.

George W. Plummer and Wharton Plummer, for appellants.

Edwin F. Abbott, for appellee.

Mr. Justice Freeman delivered the opinion of the court.

Appellants seek to reverse the judgment on the broad ground that it is unwarranted in law and by the evidence. It is first contended that the agreements in question between the Masons & Builders Association and the Bricklayers Union, and that between the Brick Manufacturers Association and the Masons & Builders Association, were

jointly as well as singly lawful and such as the parties had a right to make. The argument is, that appellants by entering into separate agreements claimed to be lawful in themselves, could not be and were not guilty of a conspiracy to accomplish an unlawful purpose, as charged in the declaration; that the agreement between the masons and builders and the bricklayers was an essential element in the combination; that this agreement was itself perfectly lawful and cannot, therefore, be regarded as entering into an unlawful combination and conspiracy. This agreement provided that the members of the Bricklayers Union should be allowed to work for members of the Chicago Masons & Builders Association, and, with a few specified exceptions, for no others; and members of the Chicago Masons & Builders Association should be allowed to employ members of the Bricklayers Union and no others. It is unnecessary, however, to consider the character of that particular agreement standing alone. A single act or agreement may be lawful and even unobjectionable in itself and yet form a part of a series of acts and agreements which are unlawful, designed and made with an intention to interfere with public, personal and property rights in unlawful ways. The material question relates to the character and operation of the combined agreements, that between the Brick Manufacturers and Masons & Builders Association in connection with that between the latter and the Bricklayers Union.

It is contended in behalf of appellee that the motive which led to the making of these agreements and the purpose for which they were made, is correctly stated in the preamble to a resolution adopted by the Masons & Builders Association pursuant to which the combination was formed. That preamble recites that, whereas the brick manufacturers "now have an organization which takes in all of the brick manufacturers of Cook County and vicinity," which is believed to be "established upon a sound and practical basis," and in the belief that "the system will control the price of brick in the future," and that an agreement will benefit

the masons and builders and strengthen the Brick Manu-
facturers Association as well, it is therefore resolved, etc.
Under that resolution a committee was appointed and
steps were taken to perfect such an agreement. Appellee
charges that the agreements were made and the "system"
established in order to drive him out of business in
Cook County, substantially his only market; and in his dec-
laration he sets forth alleged facts upon which he relies as
tending to show that the agreements were made and the
machinery which they created was used for that purpose
and actually produced that result. There is evidence tend-
ing to sustain these averments. The arrangement was well
calculated to and did "control the price of brick." Doubt-
less the operation of the agreements affected the public,
and other competitors, if such there were, as well as ap-
pellee. There is evidence which tends to show that appel-
lee was perhaps the principal active competitor-of appel-
lants in the manufacture of brick and its sale in Cook
County. The tendency of the agreement, however, was
without doubt to prevent the sale of brick in Cook County
by any one in competition with appellants. When sub-
stantially all the building contractors in Cook County agree
to buy brick exclusively from certain specified manu-
facturers and the latter agree to sell brick to such con-
tractors and to no one else, and when substantially all the
bricklayers in the county agree to handle and lay only the
brick of said manufacturers obtained through said con-
tractors and to work for the latter and no one else, there
cannot be much question as to the purpose of such agree-
ments nor as to the result. The evidence, practically un-
disputed, tends to show that as soon as the combination
was fully effected and the agreements were in operation,
the price of brick immediately arose in the Chicago market.
The purpose of the combination may be properly judged
from the inevitable results which speedily followed and
must have been anticipated. The combination gave appel-
lants arbitrary control of the price of brick, secured to them
a monopoly of the Chicago market, enabled them to drive

out competition and practically destroy the business of persons not members nor permitted to become members of the Brick Manufacturers Association.

Appellants, nevertheless, contend that the agreements, which were as the trial court found designed to accomplish and did accomplish these results, were not unlawful nor actionable. In support of this contention it is argued " it is the fundamental right of every man to conduct his own business in his own way subject only to the condition that he does not interfere with the legal rights of others," and that " what one man may lawfully do singly, many after consideration may agree to do jointly." It is doubtless true, as said in Carew v. Rutherford, 106 Mass. 1–14, cited by appellants, that " it is no crime for any number of persons without an unlawful object in view, to associate themselves together and agree that they will not work for or deal with certain classes of men or work under a certain price or without certain conditions." Yet it may become a criminal act to do things of that character in combination and in pursuance of an unlawful purpose. R. S., chap. 38, sec. 269a, *et seq*. In People v. Sheldon, 139 N. Y. 251–264, in passing upon the legality of an organization of coal dealers intended to prevent competition, the court said: " The gravamen of the offense of conspiracy is the combination. Agreements to prevent competition in trade are in contemplation of law injurious to trade because they are liable to be injuriously used. * * * We are of opinion that the principle upon which the case was submitted to the jury is sanctioned by the decisions in this State, and that the jury were properly instructed that if the purpose of the agreement was to prevent competition in the price of coal between retail dealers, it was illegal and justified the conviction of the defendants." In C., W. & V. Coal Co. v. The People, 214 Ill. 421–448, it is said, that to enter into a combination to regulate and fix the price at which coal should be sold in Northern Illinois is unlawful " at common law and under the statutes of this State, there can be no doubt." Citing, Craft v. McConoughy, 79 Ill. 346;

More v. Bennett, 140 Ill. 69; Foss v. Cummings, 149 Ill. 353; Harding v. American Glucose Co., 182 Ill. 551. In Smith v. The People, 25 Ill. 9–14, it is said, "that conspiracies to accomplish purposes which are not by law punishable as crimes, but which are violative of the rights of individuals and for which the civil law will afford a remedy to the injured party and will at the same time and by the same process punish the offender for the wrong and outrage done to society by giving exemplary damages beyond the damages actually proved, have in numerous instances been sustained as common law offenses." In Jackson v. Stanfield, 23 L. R. A: 588–595 (Indiana), it is said that "a conspiracy formed and intended, directly or indirectly, to prevent the carrying on of any lawful business or to injure the business of any one by wrongfully preventing those who would be customers from buying from the representatives of such business by threats or intimidation, is in restraint of trade and unlawful." In Bailey v. Master Plumbers, 103 Tenn. 99, it was said that the natural and intended result of agreements of the character of those in controversy "is an illegal restraint on trade, a combination and trust in limited form tending to stifle competition and to create a monopoly in a particular line and commodity." Appellants had a right doubtless to refuse to sell their brick to any or every one, a right to sell to some and refuse to sell to others, to fix a price and refuse to sell at other prices. But it is another thing to engage in a combination in restraint of trade and with the purpose of driving competitors out of business. The method adopted by appellants to drive out competition was not a mere refusal to bestow patronage on those who should sell goods to a competitor not members of a certain association, as in Macauley Bros. v. Tierney, 19 R. I. 255; nor to prevent the sale of material by wholesale dealers directly to consumers instead of to retail dealers, as in Bohn Mfg. Co. v. Hollis, 54 Minn. 223, and American Live Stock Com. Co. v. Live Stock Ex., 143 Ill. 210; nor to force out of business or refuse to do business with one who does not pay his bills, as

in Ullery v. Chicago Live Stock Exchange, 54 Ill. App. 233, and Brewster v. Miller's Sons Co., 101 Ky. 368, which are cases cited by appellants' attorneys. The distinctions are clear. While the agreements in controversy did not in set terms attempt to fix the prices of brick or control the market, they did put it in the power of appellants to do both of these things. They did not, it is true, in terms absolutely bind the brick manufacturers to sell only to the members of the Masons & Builders Association, yet such was their practical effect. They fixed a trade discount of one dollar a thousand from the contract price to be given to such members exclusively, and fined the brick makers the same amount in case any one of them should sell to outsiders. The effect was to give the members of the Masons & Builders Association a practical monopoly, in exchange for the agreement on their part to buy brick only of members of the Manufacturers Association at such prices as the latter might establish. It was monopoly for monopoly.

The form is not material in cases of this kind. It is the unlawful purpose of the combination, the methods it pursues and the results of its operation that determine its character in the eye of the law. There is evidence apparently undisputed in the case at bar of unlawful interference with appellee's business. This was consistent with and tended to show the unlawful purpose as evidenced by the acts of the parties for which the declaration avers the combination was organized. Nor do we deem it important if, as appellants' counsel contend, the evidence fails to disclose any directly active connection by any of appellants themselves with such unlawful acts. It is enough if they were done by or through other defendants who were parties to the combination, or by agents in pursuance of the objects which the combination was endeavoring to and did attain, namely, a total or general restraint of trade. Doremus v. Hennessy, 176 Ill. 608–614. See, also, Harding v. Glucose Co., 182 Ill. 551–639. Lawful competition in trade may have the effect of driving men out of business and

creating a practical monopoly in those who survive the struggle. Such competition is legitimate, however, and not actionable, although its effect in particular cases may be similar to that brought about by unlawful means employed to destroy competition. That this may happen is no excuse or justification for the use of unlawful methods, by combination or otherwise, with intent to do a wrongful injury by inducing, as in the case before us, former customers not to deal with appellee nor to buy or use brick of his manufacture. In Doremus v. Hennessey, *supra*, it is said : " Every man has a right under the law as between himself and others to full freedom in disposing of his own labor or capital according to his own will, and any one who invades that right without lawful cause or justification commits a legal wrong, and if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong." The agreements in controversy were clearly unlawful and actionable.

There is evidence tending to show that appellee suffered loss and injury from the creation and operation of the combination effected by the agreements under consideration. He was, according to the evidence, the owner of a brick-making plant with a capacity of about 15,000,000 bricks a year, which was by the defendants' action eliminated from the market. It is said by appellants' attorneys that appellee was not, strictly speaking, a brick manufacturer himself. This may be true in one sense in that he appears to have operated his plant through others in part at least, but the fact remains that he dealt in and handled brick; and any combination which destroyed the market for brick manufactured at his plant directly affected his property rights.

It is claimed by appellants that any loss of profits suffered by appellee after the combination became operative, was caused by inherent defects in appellee's brick and not by the action complained of. We do not think the evidence sustains such contention, and so far as it is conflicting the jury have determined such conflict in favor of appellee.

It is urged that the damages are excessive.  It is not disputed that after the agreements in controversy became operative in the years 1898 and 1899, the selling price of brick was nearly double what it was the year before.  Without reference to the causes of this rise in prices, the fact is apparent that any combination by which appellee was driven out of the market at that time was damaging.  There is evidence which tends to show that he suffered damages larger than the amount awarded, but it is not conclusive and not entirely convincing.  Whether any part of the verdict, and if so, how much was for punitive damages, we have no means of knowing.  We are of opinion, however, that the judgment is for a larger sum than the circumstances justify and that it may with propriety be reduced.

Careful consideration discloses no other material error in the record.  If, therefore, appellee shall within ten days remit $7,000 from the amount of the judgment, it will be affirmed for the remainder.  Otherwise the judgment will be reversed and the cause remanded.

*Affirmed upon remittitur.*

*Remittitur* filed and judgment affirmed May 9, 1905.