ADOLPH BERKOWITZ, RESPONDENT, v. HARVEY M.
LYONS, APPELLANT.

Argued June 23, 1922—Decided November 20, 1922.

1. Want of ownership of a chattel and actual misrepresentation of fact are not the sole basis of actionable fraud, since the deceit and fraud practiced can as well effect its purpose by conduct as it can by words.

2. Where money is paid to one whose agency is known he will be personally liable therefor, where he is guilty of fraud or *mala fides*, notwithstanding he may have paid the money to his principal.

3. Where a party to a suit seeks and obtains a ruling upon the trial conducive to his side, he cannot deny to his adversary any benefit which he may obtain by the application of the same ruling to his side of the case. The court's ruling in such circumstances, regardless of its abstract legal correctness, becomes the law of the case and is equally applicable to both parties.

On appeal from the Bergen County Circuit Court.

For the appellant, *Louis Ogust.*

For the respondent, *Benjamin R. Buffert.*

The opinion of the court was delivered by

MINTURN, J.  The verdict was for the plaintiff in a suit for damages, based upon an allegation of deceit in the sale of a stolen automobile to the plaintiff.  The record is unique in its details.  The culprit in the case, an elusive and ephemeral character bearing the sibilant and euphonious name of "Dolly," at once reminiscent and historic, possessed, according to the plaintiff's story, all the instincts of the proverbial Celtic insect for elusiveness and elasticity, as well as the sinister dual personality of a Jekyll and a Hyde.  One Fullage, an acquaintance of the plaintiff, was engaged in the automobile business, in the same building with defendant, in the city of New York.  Fullage conceived the idea, after meeting the cryptic "Dolly" and the defendant, that the

plaintiff might participate with him on a fifty-fifty basis of the profits, in the purchase of an auto that "Dolly" possessed. The plaintiff, entertaining boundless confidence in Fullage, yielded to the attraction, supplied the $1,050 necessary, purchased the auto, and in a few days thereafter surrendered it to the police of New York as stolen property. Obviously, there was no tangible profit in such a transaction, and so the plaintiff immediately set himself upon the trail of "Dolly." He went about paraphrasing a popular inquiry in Connecticut and elsewhere, in effect, asking whether anyone there had seen "Dolly." His search was fruitless. The defendant, who acted as the intermediary for "Dolly" upon the sale, stated that he met "Dolly" at the "Campus" Restaurant in New York City; "Dolly" there told him of the new Buick car he had and desired to sell, owing to the fact that the gambling business, which he pursued, had served the purpose for him and his earnings, of a bottomless pit, akin to that described in "Paradise Lost:"

> "Like that Serbonian dog,
>  Betwixt Damietta and Mount Cassius old,
> Where armies whole have sunk."

The defendant interested Fullage, and the latter interested the plaintiff on the fifty-fifty basis, with the result that, on the same afternoon, two unknown young men, who immediately vanished, drove the machine from Edgewater, New Jersey, to the plaintiff's place of business, where the plaintiff accepted delivery of the bill of sale, executed by "Dolly" from the hands of the defendant, delivered his check to defendant, payable to the order of "Dolly," and thereafter became the satisfied owner of the automobile for a few days, until he surrendered it to the police, who delivered it to the *bona fide* owner, from whom it had been stolen. When the auto left Edgewater for delivery, one of the two men driving it, and who suddenly vanished, according to the defendant, was "Dolly." Why "Dolly" left the machine at plaintiff's door and vanished without personally closing the transaction, when Fullage and the plaintiff were in the same building, instead of leaving the completion of the transaction and the

receipt of the check to the defendant, who was an apparent stranger to the proceeding, does not appear, except that, as defendant explains, "Dolly" was called to Connecticut, and the defendant acted for the purpose as his *alter ego*. Before the delivery of the bill of sale, plaintiff was troubled as to the actors in the transaction. The question then with him was not "who is 'Dolly,' " but "where is 'Dolly.' " The plaintiff persisted in calling defendant Mr. Dolly, but defendant finally rejoined, "I am not 'Dolly,' he lives at 242 Main street, Bridgeport, Connecticut." Fullage, in answer to an inquiry, assured the plaintiff that everything was correct. But when the illusion had vanished with the surrender of the car to the police, and plaintiff had endeavored to trace "Dolly," he found him as elusive in Bridgeport as he had found him in New York, for there was no such number on the street called Main in Bridgeport. No one seems to have met "Dolly" except the defendant and some of his witnesses, and least of all the police. One witness rode with a man of that name to the Edgewater ferry, and the defendant rode with him to and cashed the check at the Edgewater bank, receiving $50 for his services. Defendant insists that he came into the transaction only as a messenger to deliver the bill of sale and receive the check. What became of "Dolly" was asked of the defendant. "He got off at the ferry, and I said I will see you in a couple of days, and I have been looking for him ever since." Fullage, the business friend, who had met "Dolly" through the defendant, who introduced him as "a fellow who had gone broke gambling," and who had a car for sale, went with "Dolly" out driving, so that "Dolly" might show him the car to advantage, like the ruins of Melrose, at night, and thereafter the deal with the plaintiff was consummated. Apparently there was no public exhibition of the car by day, excepting upon the day it was delivered to plaintiff, when it was driven from Edgewater to New York, by the unknown young men, who suddenly, and without the formality of an introduction, vanished. It is noticeable in the testimony that while Lyons says one of the young men who brought the car over the ferry was "Dolly," Fullage,

who knew "Dolly," merely mentions that "two young fellows" brought the car to plaintiff's place, and then disappeared.

Van Gelder, the notary, took the acknowledgment of a young man, representing himself as "Dolly," to the bill of sale, and saw him execute it at Edgewater, in the presence of the defendant and two witnesses, and thereafter he saw him no more. Sherer, a truck driver for defendant, met "Dolly" at Edgewater a few times, and originally met him at the "Campus" restaurant in New York with others. He drove "Dolly" to the bank with defendant, when the check was cashed; "Dolly" curiously remained outside while defendant cashed the check, and then disappeared with the proceeds.

It is insisted for error upon this state of facts that the learned trial court should have nonsuited or directed a verdict, because the defendant did not sell the car, and made no representations concerning it. We think the trial court was legally justified in refusing both requests.

The inquiry of facts under the pleadings and proofs was whether there was such a person in reality as "Dolly," or whether such an ambidextrous character was created for the practical purpose of supplying a fictitious person, to enable the defendant to safely dispose of the stolen car. In such a situation want of ownership and actual misrepresentations of fact are not the sole basis of actionable fraud, since the deceit and fraud practiced can as well effectuate its baneful purpose by conduct as it can by words. *"Acta exteriora indicant interiora secreta."* Indeed, the action for deceit had its origin in false impersonation. As early as 9 and 10 *Edw. I,* the original writ of the King's Bench went because in many causes actions were brought by suitors, without authority, and judgments were entered against defendants, whose presence was impersonated in the levying of a fine. 2 *Poll. & Mait. His. Eng. L.* 534, &c.

Since that period Lord Cairns in the House of Lords declared: "If one conducts himself in a particular way with

the object of fraudulently inducing another to believe in the existence of a certain state of things, and to act upon the basis of its existence, and damage resulted therefrom to the party misled, he who misled him will be just as liable as if he had misrepresented the facts in express terms." *Northeastern Railway Co.* v. *Wanless, L. R. 7 H. L.* 12; *Downey* v. *Finnecone,* 205 *N. Y.* 251.

So we find it stated generally that: "It may consist in the creation of a false impression by words or acts, or by any trick or device, a deep laid scheme of swindling, or a direct falsehood, a combined effort of a number of associates or the sole effort of a solitary individual." 12 *R. C. L.* 232, and cases cited.

An issue of that nature necessarily involves the determination of a question of fact, and its solution is peculiarly for the jury. *Cole* v. *Taylor,* 22 *N. J. L.* 59; *Crosby* v. *Wells,* 73 *Id.* 790; *Bingham* v. *Fish,* 86 *Id.* 316.

Liability of the defendant may also be predicated upon his own conception of the case, which places him in the status of *quasi*-agent or representative of "Dolly." He it was who become the emissary of "Dolly" to secure a purchaser; he it was who interested Fullage, and to whom Fullage 'phoned that he had secured the plaintiff as purchaser; he it was who arranged the execution of the bill of sale and delivered it to the plaintiff; he it was who took the plaintiff's check in payment and cashed it, after giving the fictitious address of "Dolly" in Bridgeport. His part in the transaction, therefore, at the very best, classifies him as the agent or representaive of "Dolly," and the rule in such a situation is well settled; that where money is paid to one whose agency is known, he will be personally liable therefor; where he is guilty of fraud or *mala fides,* notwithstanding he may have paid the money to his principal. *Oates* v. *Hudson,* 20 *L. J. Ex.* (*N. S.*) 284; *Wright* v. *Eaton,* 7 *Wis.* 595; *Carew* v. *Rutherford,* 106 *Mass.* 1; *Moore* v. *Shields,* 121 *Ind.* 267; *Bennett* v. *Ives,* 30 *Conn.* 329. Notes to *Simmonds* v. *Long,* 23 *L. R. A.* (*N. S.*) 553.

The same rule has been adopted in this state. *Bocchino* v. *Cook,* 67 *N. J. L.* 467; *White* v. *N. Y. & S. Ry. Co.,* 68 *Id.* 123; *Martin* v. *Baldwin,* 90 *Id.* 241, 244.

In the latter case this court declared, in an action for deceit, that in such a situation there was imposed upon the defendant, as agent, "the duty, at, least, to refrain from actively perpetrating a fraud in his own interest, or in the interest of his principal, to the detriment and damage of another."

From, either aspect of the case, therefore, it was open to the jury to charge the defendant with liability. Certain procedural errors are alleged as a basis for reversal. Among these was the refusal of the court to allow a bank representative, who was familiar with Van Gelder's handwriting, to testify as to the writing and signature on the bill of sale, but Van Gelder, who had written it, admitted that, except the signature of "Dolly," the handwriting was his, so that the court's action in this respect was harmless to defendant. Van Gelder, who had seen "Dolly" write his name to the bill of sale, was called to testify as to who in his opinion endorsed the check. This the court overruled, and we think improperly. *Wilson* v. *Clear,* 85 *N. J. L.* 474; *West.* v. *State,* 22 *Id.* 213; 22 *C. J.* 626, and cases.

But like the previous inquiry, its effect upon defendant's case was non-injurious, for upon the only inquiry presented here, *i. e.,* whether the defendant impersonated "Dolly," or whether defendant was in fact "Dolly's" agent in the deceit, the collateral inquiry whether Van Gelder signed the bill of sale or endorsed the check, can have little or no bearing, since the fugitive "Dolly" might be represented by anyone capable of writing and playing the part. Van Gelder may be conceded to be an innocent instrumentality in the hands of designing men, to whom an alleged "Dolly" was introduced, and yet defendant's liability on the lines we have indicated would persist. The ruling was therefore non-injurious to defendant. *Title Guaranty Co.* v. *Fusco Co.,* 90 *N. J. L.* 630.

An offer to prove conversations between defendant and Fullage and "Dolly," in the absence of plaintiff, was overruled. We think this was not erroneous, for the reason that defendant had early in the case objected successfully to the introduction of a conversation between plaintiff and Fullage, in defendant's absence. This ruling, therefore, on defendant's motion became the law of the case, and defendant now, regardless of the abstract legal correctness of the ruling, is concluded by it. *Edgewater* v. *Valvolene Co.*, 76 N. J. L. 789; *Berg* v. *Motor Co.*, 78 Id. 725.

It may be finally stated that our examination of the record concerning the alleged errors of procedure, in the light of the requirement of section 27 of the Practice act of 1912, which requires an affirmance of the judgment, "unless upon an examination of the whole case it shall appear that the error injuriously affected the substantial rights of the party," has resulted in the conclusion, that no such error is discoverable, and, theerfore, the judgment must be affirmed.

Such will be the rule.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, BLACK, WHITE, GARDNER, VAN BUSKIRK, JJ. 10.

*For reversal*—PARKER, KATZENBACH, WILLIAMS, JJ. 3.