ROBERT H. PICKETT & others *vs.* PATRICK J. WALSH
& others.

Suffolk.   May 17, 1906. — October 16, 1906.

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & SHELDON, JJ.

*Equity Jurisdiction*, To enjoin conspiracy, To enjoin unlawful interference with contract,
   Remedy at law.  *Conspiracy.  Labor Union.  Strike.  Equity Pleading and
   Practice*, Parties, Amendment, Decree.

A strike by the members of a bricklayers' union and the members of a stone
   masons' union in refusing to lay bricks or stone for a contractor in the con-
   struction of a certain building unless also employed to do the pointing of the
   mortar after the bricks and stones have been laid, and unless other persons, who
   are pointers but not bricklayers or stone masons and whom the contractor pre-
   fers to employ because they do the work of pointing better and for less pay,

are discharged by him, does not entitle the pointers, when discharged by the contractor by reason of the strike, to maintain a suit in equity to enjoin the acts of the members of the unions on the ground that such acts constitute an unlawful conspiracy.

What is lawful for an individual may be unlawful when done by a combination of individuals.

A union of bricklayers and a union of stone masons lawfully may exclude from membership in their respective unions pointers of mortar who are not bricklayers or masons.

The right of coercion and compulsion which a labor union lawfully may exercise is limited to strikes against persons with whom the organization has a trade dispute.

A pointer of mortar employed by the owner of a building to point the mortar on the building after the bricks and stones have been laid may maintain a suit in equity to enjoin the members of a bricklayers' union and the members of a stone masons' union from refusing to work for a contractor in laying brick or stone in the construction of the building unless the contractor will join them in compelling the owner of the building to discharge the pointer, and also to enjoin the defendants from exercising compulsion on the contractor for the same purpose by refusing to work for him in the construction of other buildings.

In a suit in equity against the officers and members of a labor union to enjoin the defendants from unlawful interference with a contract between the plaintiff and the owner of a building for the doing of certain work thereon, whether the bill will be dismissed on the ground that damages in an action at law would give the plaintiff adequate compensation for the breach of contract, if that objection is taken properly, *quaere.* Here the point was not passed upon because the objection was not taken.

An unincorporated labor union cannot be made a party to a suit in equity to enjoin the unlawful acts of its officers and members.

In a suit in equity to enjoin certain unlawful acts of the officers and members of an unincorporated labor union, if the union itself which has no legal entity has been joined improperly as a defendant, the plaintiff after a decree in his favor may be allowed to amend his bill by striking out the union as a defendant and inserting proper allegations to bind the members of the union as parties defendant, if these members would suffer no damage from the bill being so amended at that time.

On an appeal from a final decree in favor of a plaintiff in a suit in equity it was ordered that on the bill being amended in a certain manner as to the parties defendant within sixty days the decree might be modified as required by this court and on being so modified should be affirmed; otherwise, that it should be reversed.

LORING, J. This suit in equity comes before us on an appeal from a final decree, where the evidence was taken by a commissioner and where no findings of fact were made in the lower court.

The bill was brought to enjoin the defendants from combining and conspiring to interfere with the plaintiffs in pursuing their trade of brick and stone pointers. The purpose of the bill as

stated in the prayers for relief was to enjoin the defendants (1) from combining and conspiring in any way to compel L. P. Soule and Son Company, or any other person, firm or corporation, by force, threats, intimidation or coercion, to discharge the complainants in the bill of complaint, to wit: Robert H. Pickett, Charles A. Pickett, Thomas J. Lally and Walter H. Wilkins, or to refrain from further employing them in and about their trade and occupation; (2) from combining and conspiring to compel the owners of the so-called Ford Building on Ashburton Place in the City of Boston to break or decline to carry out their said contract with the complainant Robert H. Pickett; and (3) from combining and conspiring to interfere with the said complainants, or any of them, in the practice of their trade and occupation, or to prevent them from obtaining further employment thereat.

The defendants were the officers of two unincorporated bricklayers' unions, to wit, Unions No. 3 and No. 27, and of one stone masons' union, to wit, Union No. 9. The plaintiffs also undertook to make each one of the three unincorporated unions parties defendant. The Bricklayers' Union No. 27 seems from the evidence not to have been concerned in the matters in dispute. For this reason we shall not refer to it again except to show later on that there is no evidence that it took part in the matters here in question. The individual defendants were one Driscoll, the walking delegate of the Bricklayers' Union No. 3, one Walsh, the walking delegate of the Stone Masons' Union No. 9, and other persons who were officers of those two unions.

It appears from the evidence that the trade of brick and stone pointing is a trade which, in the neighborhood of the city of Boston at any rate, has been carried on to some extent as a separate trade for nearly if not quite one hundred years. It further appears that there are now some forty-five men engaged in that trade in the vicinity of that city.

The trade of a brick or a stone pointer consists in going over a building (generally when it is first erected) to clean it and to put a finish on the mortar of the joints. Apparently in the city of Worcester, and to some extent in the city of Boston, this work of pointing is done by bricklayers and stone masons.

The dispute which gave rise to the suit now before us had its

origin in a set of rules adopted in January, 1905, by the Brick-layers' and Masons' International Union of America, to which the two unions here in question were subordinate. This set of rules contained a provision that bricklaying masonry should consist (*inter alia*) of " all pointing and cleaning brick walls," and that stone masonry should consist (*inter alia*) of the " cleaning and pointing of stone work." The practical working of the principles of brick and stone masonry as defined in these rules was left to the subordinate unions.

By the Constitution, By-Laws and Rules of Order of the Bricklayers' Union No. 3, it is provided that members shall not accept employment " where a difficulty exists in consequence of questions involving the rules which govern the Union," and that any member violating a law of the union shall on conviction " be reprimanded, suspended or fined at the discretion of the Union." No similar provision appears in the extract from the Constitution of the Stone Masons' Union which was in evidence, but it is not a violent assumption from the action of the masons and from the testimony of Walsh, the walking delegate of the Stone Masons' Union, that the members of the Masons' Union stood on the same footing as the members of the Bricklayers' Union in this respect.

In other words, the make-up of the two unions was such that any member of a subordinate union (which had adopted a work-ing rule containing in substance the provisions of the working rules of the International Union as to cleaning and pointing buildings) who continued to work on a job on which a pointer was at work was liable to be reprimanded, fined or suspended.

This brings us to the action taken by the unions here in question.

There was an executive committee of the two unions. On July 28, 1905, this executive committee voted " that beginning September 18, 1905, no member of the Bricklayers' and Masons' unions of Boston and vicinity, will work on any building where the contractor will not agree to have the pointing done by brick-layers or masons."

This action of the executive committee was formally adopted by the Bricklayers' Union No. 3, and seems to have been in-formally adopted by the Stone Masons' Union No. 9. In pur-

suance thereof the following circular letter was issued: "The Bricklayers' and Masons' Unions of Boston and vicinity have voted that no bricklayer or mason will work for any firm or contractor who will not employ bricklayers or masons to do the pointing of brick, terra cotta and stone masonry. This action to go into effect September 18, 1905."

In September, 1905, L. D. Willcutt and Son as general contractors were erecting (among other buildings) a stone building on the corner of Massachusetts Avenue and Boylston Street in Boston. On the eighteenth day of that month, Mr. L. D. Willcutt of that firm was notified that if he did not discharge the pointers who were working for his firm in pointing that building all the masons and bricklayers working for his firm on other buildings in Boston (all of whom were union men) would strike. Thereupon he suspended the work which was being done by the pointers on the building on the corner of Massachusetts Avenue and Boylston Street. This evidence was admitted to show that there was a general scheme that where pointing was given to any one beside union bricklayers and stone masons there would be a strike.

On November 13, 1905, the defendant Walsh, the walking delegate of the Stone Masons' Union No. 9, and the defendant Driscoll, the walking delegate of the Bricklayers' Union No. 3, came to the Ford Building, for which the corporation of L. P. Soule and Son Company were the general contractors, and found that the cleaning and the pointing of that building were being done under a contract between the owners of the building and Robert H. Pickett, one of the plaintiffs here. They then went to a brick building which was being erected by the L. P. Soule and Son Company as contractors, a cold storage warehouse on Eastern Avenue, and there Driscoll notified the men that the pointing at the Ford Building was being done by pointers. In consequence all the bricklayers employed by the L. P. Soule and Son Company on the cold storage building, fifty in all, being union men, struck work on that or the next day. The next day, November 14, Walsh went to a stone building which was being erected by the same corporation for the International Trust Company on the corner of Arch Street and Devonshire Street, and told the workmen there of the pointing on the Ford

Building; whereupon all the stone masons working there, five or six in all, being union men, struck work.

This bill was filed in the Superior Court on November 21, 1905. It seems to have come on for hearing on December 5, 1905. As we have said, the evidence was taken by a commissioner, a final decree in favor of the plaintiffs on all three grounds was made on December 11, without any special findings of fact, and the case is here on appeal from that decree.

It appeared from the testimony of Parker F. Soule (an officer of the L. P. Soule and Son Company) that it was cheaper to make a contract with pointers for the work of pointing and cleaning than to employ stone masons and bricklayers to do that work. It appeared from other evidence that the wages of a bricklayer or stone mason were fifty-five cents an hour, while pointers are paid three dollars for a day of eight hours, or thirty-seven and one half cents an hour. It further appeared from Mr. Soule's testimony that he preferred to give the work to the pointers because in cleaning a building acid has to be used, and, if the acid is used to excess, stains are caused which in some instances it is impossible to " get out "; and that he did not think that the bricklayers and stone masons were competent to use these acids. He also preferred to give the work to the pointers because the work which is done by the pointers usually is done by contract, in which case the general contractor who employs the pointers is relieved from responsibility on account of accidents which may occur because of the fact that the work is done on a swinging stage, at times at great heights. Again it appeared from the evidence that L. P. Soule and Son Company were not the only contractors who thought that they got better work at a smaller cost and with less liability by making a contract with stone pointers for the doing of this work than by employing stone masons and bricklayers to do it.

All this was explained to the walking delegate of the Bricklayers' Union here in question at an interview between Mr. Soule and the walking delegate of that union held within two days of the strike. It also appeared that at that interview the delegate told Mr. Soule that, while it had been against the rules of the union that any member should take piece work, the taking of piece work recently had been allowed; whereupon Mr. Soule

told him that " if he had any members of his union who were reliable men, whom we could have confidence enough in to let a contract to, who would give prices as low, . . . he would have no trouble in getting all the stone pointing there was going." No offer to make a contract on these terms was made, and on the evidence it must be assumed that there was nothing in this statement of the defendant Walsh.

It further appeared from the evidence that the brick and stone pointers of Boston applied to the Building Trades Council for a charter. It is stated in the record of the Brick Masons' Union No. 3, that " the said pointers about a year ago applied to the A. F. of L. for a charter, which was denied them, the American Federation of Labor taking the stand that brick and stone pointing was a part of the bricklayers' and masons' trade." On September 11, 1905, the Brick Masons' Union No. 3 voted to " file a protest to the B. T. C. against their granting a charter to the brick and stone pointers of Boston," and on September 18 it was voted " that this Committee [sic] send communication to B. T. C. requesting that body not to grant a charter to the so-called brick and stone pointers." It was admitted that the men engaged in the business of brick and stone pointers were not qualified for the business of bricklayers and stone masons.

There was evidence that at the interview between Driscoll and Mr. Willcutt, Mr. Willcutt told Driscoll that he did not believe that, when there were twelve hundred men in the union and thirty pointers outside, all this fuss was being made to get the pointers' work for the union men; that he thought it was " simply a question of dictation to us " ; and on Mr. Willcutt's asking him (Driscoll) " Do you really want it or do you want to drive the men out of business? " Driscoll smiled and said: " That is a charitable way of looking at it."

There seem to be three causes of action upheld by the decree.

In the first place, Robert H. Pickett, one of the plaintiffs, had a contract with the owners of the Ford Building and was at work under it when the defendants struck. He seeks protection from a strike on L. P. Soule and Son Company to force the owners of the Ford Building to give this work to the unions

and to take it away from him. Except for the fact of this contract, in which the plaintiff Robert H. Pickett alone was concerned, the first and second causes of action are alike.

The second cause of action consists in the effort of all the plaintiffs to be protected from being discharged or not employed by the L. P. Soule and Son Company because the defendants struck work for that corporation so long as that corporation worked on a building on which Robert H. Pickett was employed by the owners of that building.

Finally, the plaintiffs sought to be protected against a strike by the defendants in order to get the work of pointing for the members of their unions.

No objection has been taken to the bill on the ground of multifariousness. We therefore shall consider all three causes of action.

We will consider first the last of the three causes of action.

The question, so far as this the third cause of action goes (apart from a question of fact which we will deal with later on), is whether the defendant unions have a right to strike for the purpose for which they struck; or, to put it more accurately and more narrowly, it is this: Is a union of bricklayers and stone masons justified in striking to force a contractor to employ them by the day to do cleaning and pointing at higher wages than pointers are paid, where the contractors wish to make contracts with the pointers for such work to be done by the piece because they think they get better work at less cost with no liability for accidents, and where the pointers wish to make contracts for that work with the contractors on terms satisfactory to them ?

In other words, we have to deal with one of the great and pressing questions growing out of the existence of the powerful combinations, sometimes of capital and sometimes of labor, which have been instituted in recent years where their actions come into conflict with the interests of individuals. The combination in the case at bar is a combination of workmen, and the conflict is between a labor union on the one hand and several unorganized laborers on the other hand.

It is only in recent years that these great and powerful combinations have made their appearance, and the limits to which

they may go in enforcing their demands are far from being settled.

It is settled however that laborers have a right to organize as labor unions to promote their welfare.

Further, there is no question of the general right of a labor union to strike.

On the other hand it is settled that some strikes by labor unions are illegal. It was held in *Carew* v. *Rutherford*, 106 Mass. 1, that a strike by the members of a labor union was illegal when set on foot to force their employer to pay a fine imposed upon him by the union of which he was not a member, for not giving the union all his work. To the same effect see *March* v. *Bricklayers' & Plasterers' Union No. 1*, 79 Conn. 7. Again, it was held in *Plant* v. *Woods*, 176 Mass. 492, that a labor union could not force other workmen to join it by refusing to work if workmen were employed who were not members of that union. To the same effect see *Erdman* v. *Mitchell*, 207 Penn. St. 79; *O'Brien* v. *People*, 216 Ill. 354; *Loewe* v. *California State Federation of Labor*, 139 Fed. Rep. 71. And see in this connection *Giblan* v. *National Amalgamated Labourers' Union*, [1903] 2 K. B. 600.

When and for what end this power of coercion and compulsion commonly known as a strike may be legally used is the question which this case calls upon us to decide. In the present state of the authorities it becomes necessary to consider the general principles governing labor unions and strikes by labor unions.

The right of laborers to organize unions and to utilize such organizations by instituting a strike is an exercise of the common law right of every citizen to pursue his calling, whether of labor or business, as he in his judgment thinks fit. It is pointed out in *Carew* v. *Rutherford*, 106 Mass. 1, 14, that in the earlier days of the colony the government undertook to control the conduct of labor and business to some extent, but that later this policy of regulation was abandoned and all citizens were left free to pursue their calling, whether of labor or business, as seemed to them best. This common law right was raised to the dignity of a constitutional right by being incorporated in the Constitution of the Commonwealth. So far as the question now before us goes it is of no consequence whether

the right to pursue one's calling (whether it be of labor or of business) is a common law right or a constitutional right, since the violation of it here complained of is on the part of individuals and not on the part of the Legislature.  What is of consequence here is that such a right exists.  In article 1 of the Declaration of Rights it is declared that " All men are born free and equal, and have certain natural, essential, and unalienable rights; among which may be reckoned the right of . . . acquiring, possessing, and protecting property; in fine, that of seeking and obtaining their safety and happiness."  It is in the exercise of this right that laborers can legally combine together in what are called labor unions.

This right of one or more citizens to pursue his or their calling as he or they see fit is limited by the existence of the same right in all other citizens.  The right and the result are accurately stated by Sir William Erle in his book on Trade Unions in these words: " Every person has a right under the law, as between him and his fellow subjects, to full freedom in disposing of his own labor or his own capital according to his own will.  It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction to the fullest exercise of this right which can be made compatible with the exercise of similar rights by others " : cited by this court in *Plant* v. *Woods*, 176 Mass. 492, 498.

We now have arrived at the point where a labor union, being an organization brought about by the exercise on the part of its members of the right of every citizen to pursue his calling as he thinks best, is limited in what it can do by the existence of the same right in each and every other citizen to pursue his and their calling as he or they think best.

In addition to the limitation thus put on labor unions there is a fact which puts a further limitation on what acts a labor union can legally do.  That is the increase of power which a combination of citizens has over the individual citizen.  Take for example the power of a labor union to compel by a strike compliance with its demands.  Speaking generally a strike to be successful means not only coercion and compulsion but coercion and compulsion which, for practical purposes, are irresistible.  A successful strike by laborers means, in many if not

in most cases, that for practical purposes the strikers have such a control of the labor which the employer must have that he has to yield to their demands. A single individual may well be left to take his chances in a struggle with another individual. But in a struggle with a number of persons combined together to fight an individual the individual's chance is small, if it exists at all. It is plain that a strike by a combi-. nation of persons has a power of coercion which an individual does not have.

The result of this greater power of coercion on the part of a combination of individuals is that what is lawful for an individual is not the test of what is lawful for a combination of individuals; or to state it in another way, there are things which it is lawful for an individual to do which it is not lawful for a combination of individuals to do. Take for example the example put in *Allen* v. *Flood*, [1898] A. C. 1, 165, of a butler refusing to renew a contract of service because the cook was personally distasteful to him, whereupon, in order to secure the services of the butler, the master refrains from re-engaging the cook whose term of service also had expired. We have no doubt that it is within the legal rights of a single person to refuse to work with another for the reason that the other person is distasteful to him, or for any other reason however arbitrary. But it is established in this Commonwealth that it is not legal (even where he wishes to do so) for an employer to agree with a union to discharge a non-union workman for an arbitrary cause at the request of the union. *Berry* v. *Donovan*, 188 Mass. 353. *A fortiori* the members of a labor union cannot by a strike refuse to work with another workman for an arbitrary cause. For the general proposition that what is lawful for an individual is not necessarily lawful for a combination of individuals see *Quinn* v. *Leathem*, [1901] A. C. 495, 511; *Mogul Steamship Co.* v. *McGregor*, 23 Q. B. D. 598, 616; *S. C.* on appeal, [1892] A. C. 25, 45; *Gregory* v. *Brunswick*, 6 M. & G. 205; *S. C.* on appeal, 3 C. B. 481. It is in effect concluded by *Plant* v. *Woods*, 176 Mass. 492.

These being the general principles, we are brought to the question of the legality of the strike in the case at bar, namely, a strike of bricklayers and masons to get the work of pointing,

or, to put it more accurately, a combination by the defendants, who are bricklayers and masons, to refuse to lay bricks and stone where the pointing of them is given to others. The defendants in effect say we want the work of pointing the bricks and stone laid by us, and you must give us all or none of the work.

The case is one of competition between the defendant unions and the individual plaintiffs for the work of pointing. The work of pointing for which these two sets of workmen are competing is work which the contractors are obliged to have. One peculiarity of the case therefore is that the fight here is necessarily a triangular one. It necessarily involves the two sets of competing workmen and the contractor, and is not confined to the two parties to the contract, as is the case where workmen strike to get better wages from their employer or other conditions which are better for them. In this respect the case is like *Mogul Steamship Co.* v. *McGregor*, 23 Q. B. D. 598; *S. C.* on appeal [1892] A. C. 25.

The right which the defendant unions claim to exercise in carrying their point in the course of this competition is a trade advantage, namely, that they have labor which the contractors want, or, if you please, cannot get elsewhere; and they insist upon using this trade advantage to get additional work, namely, the work of pointing the bricks and stone which they lay. It is somewhat like the advantage which the owner of back land has when he has bought the front lot. He is not bound to sell them separately. To be sure the right of an individual owner to sell both or none is not decisive of the right of a labor union to combine to refuse to lay bricks or stone unless they are given the job of pointing the bricks laid by them. There are things which an individual can do which a combination of individuals cannot do. But having regard to the right on which the defendants' organization as a labor union rests, the correlative duty owed by it to others, and the limitation of the defendants' rights coming from the increased power of organization, we are of opinion that it was within the rights of these unions to compete for the work of doing the pointing and, in the exercise of their right of competition, to refuse to lay bricks and set stone unless they were given the work of pointing them when laid.

See in this connection *Plant* v. *Woods,* 176 Mass. 492, 502; *Berry* v. *Donovan,* 188 Mass. 353, 357.

The result to which that conclusion brings us in the case at bar ought not to be passed by without consideration.

The result is harsh on the contractors, who prefer to give the work to the pointers because (1) the pointers do it by contract (in which case the contractors escape the liability incident to the relation of employer and employee); because (2) the contractors think that the pointers do the work better, and if not well done the buildings may be permanently injured by acid; and finally (3) because they get from the pointers better work with less liability at a smaller cost. Again, so far as the pointers (who cannot lay brick or stone) are concerned, the result is disastrous. But all that the labor unions have done is to say you must employ us for all the work or none of it. They have not said that if you employ the pointers you must pay us a fine, as they did in *Carew* v. *Rutherford,* 106 Mass. 1. They have not undertaken to forbid the contractors employing pointers, as they did in *Plant* v. *Woods,* 176 Mass. 492. So far as the labor unions are concerned the contractors can employ pointers if they choose, but if the contractors choose to give the work of pointing the bricks and stones to others the unions take the stand that the contractors will have to get some one else to lay them. The effect of this in the case at bar appears to be that the contractors are forced against their will to give the work of pointing to the masons and bricklayers. But the fact that the contractors are forced to do what they do not want to do is not decisive of the legality of the labor union's acts. That is true wherever a strike is successful. The contractors doubtless would have liked it better if there had been no competition between the bricklayers' and masons' unions on the one hand and the individual pointers on the other hand. But there is competition. There being competition, they prefer the course they have taken. They prefer to give all the work to the unions rather than get non-union men to lay bricks and stone to be pointed by the plaintiffs.

Further, the effect of complying with the labor unions' demands apparently will be the destruction of the plaintiffs' business. But the fact that the business of a plaintiff is destroyed

by the acts of the defendants done in pursuance of their right of competition is not decisive of the illegality of the acts. It was well said by Hammond, J. in *Martell* v. *White*, 185 Mass. 255, 260, in regard to the right of a citizen to pursue his business without interference by a combination to destroy it : " Speaking generally, however, competition in business is permitted, although frequently disastrous to those engaged in it. It is always selfish, often sharp, and sometimes deadly."

We cannot say on the evidence that pointing is something foreign to the work of a bricklayer or a stone mason and therefore something which a union of bricklayers and stone masons have no right to compete for or insist upon, and so bring the case within *Carew* v. *Rutherford*, 106 Mass. 1 ; *March* v. *Bricklayers & Plasterers Union No. 1*, 79 Conn. 7 ; and *Giblan* v. *National Amalgamated Labourers' Union*, [1903] 2 K. B. 600. On the contrary the evidence shows that in Boston the pointing is done to some extent by bricklayers and stone masons, and there is no evidence that the trade of pointers exists outside that city.

The protest of the defendant unions against the plaintiffs being allowed to organize a pointers' union is not an act of oppression. It is not like the refusal of the union in *Quinn* v. *Leathem*, [1901] A. C. 495, to work with the non-union men or to admit the non-union men to their union. The defendants' unions are not shown to be unwilling to admit the plaintiffs to membership if they are qualified as bricklayers or stone masons. But the difficulty is that the plaintiffs are not so qualified. They are not bricklayers or masons. The unions have a right to determine what kind of workmen shall compose the union, and to insist that pointing shall not be a separate trade so far as union work is concerned. They have not undertaken to say that the contractors shall not treat the two trades as distinct. What they insist upon is that if the contractors employ them they shall employ them to do both kinds of work.

The application of the right of the defendant unions, who are composed of bricklayers and stone masons, to compete with the individual plaintiffs, who can do nothing but pointing (as we have said,) is in the case at bar disastrous to the pointers and hard on the contractors. But this is not the first case where the

exercise of the right of competition ends in such a result. The case at bar is an instance where the evils which are or may be incident to competition bear very harshly on those interested, but in spite of such evils competition is necessary to the welfare of the community.

So far as previous decisions go the case which comes nearest to the case at bar in the kind of question raised is that of *Allen* v. *Flood*, [1898] A. C. 1. In that case there was a dispute between shipwrights and boiler makers as to iron work in shipbuilding. It was stated by some of the judges (see for example Lord Watson at p. 99; Lord Herschell at p. 129; Lord Macnaghten at p. 151) that it was lawful for either to strike to get this work from the other. But the decision in *Allen* v. *Flood* went off on another ground. See Lord Halsbury, Ch. in *Quinn* v. *Leathem*, [1901] A. C. 495.

The defendants have urged upon us the case of *Bowen* v. *Matheson*, 14 Allen, 499. But although so far as the third cause of action here in question is concerned we have reached the result arrived at in that case, we have reached it on other grounds. That case went up on demurrer and the ground on which that case was decided was that on the allegations in the declaration it was to be treated as one of the class of cases of which *Parker* v. *Huntington*, 2 Gray, 124, is the leading case in this Commonwealth, and *Bilafsky* v. *Conveyancers Title Ins. Co.*, *ante*, 504, is the last, namely, cases in which the allegations of conspiracy are not allegations of a tortious act in and of themselves, but are simply allegations that the defendants joined in doing acts otherwise alleged to be tortious. It is not now material to inquire whether *Bowen* v. *Matheson* should or should not have been held to belong to this class of cases, for it is settled in this Commonwealth, as we have already said, that the line within which a combination of individuals like a labor union must confine its actions is drawn much closer than in case of the same individuals acting separately.

The plaintiffs have asked us to find on the evidence that the actions of the unions and of the business agents and other officers and of the members in compelling L. P. Soule and Son Company to discharge " the plaintiffs was due in part to a desire to further and protect their own interests, or what they conceived

to be such, but more to a reckless and wanton, if not malicious, disregard of the rights of the plaintiffs and of others engaged in the business of pointing and to a determination to force them out of business and thereby deprive them of their accustomed means of earning a livelihood."

We find on the evidence that the plaintiffs have not made out the fact that the defendants' action was due to a reckless and wanton, if not malicious disregard of the rights of the plaintiffs and of others engaged in the business of pointing. Under these circumstances we do not find it necessary to decide what would have been the result had we found that fact. See in this connection Bowen, L. J. in *Mogul Steamship Co.* v. *McGregor*, 23 Q. B. D. 598, 615.

It follows that the third clause of the decree, which follows the third prayer of the bill, must be stricken out.

This brings us to the legality of the strike by the union bricklayers and masons employed by the L. P. Soule and Son Company on other buildings because that corporation was doing work on a building on which work was being done by pointers employed not by the L. P. Soule and Son Company but by the owners of the building.

That strike has an element in it like that in a sympathetic strike, in a boycott and in a blacklisting, namely: It is a refusal to work for A, with whom the strikers have no dispute, because A works for B, with whom the strikers have a dispute, for the purpose of forcing A to force B to yield to the strikers' demands. In the case at bar the strike on the L. P. Soule and Son Company was a strike on that contractor to force it to force the owner of the Ford Building to give the work of pointing to the defendant unions. That passes beyond a case of competition where the owner of the Ford Building is left to choose between the two competitors. Such a strike is in effect compelling the L. P. Soule and Son Company to join in a boycott on the owner of the Ford Building. It is a combination by the union to obtain a decision in their favor by forcing third persons who have no interest in the dispute to force the employer to decide the dispute in their (the defendant unions') favor. Such a strike is not a justifiable interference with the right of the plaintiffs to pursue their calling as they think best. In our opinion organ-

ized labor's right of coercion and compulsion is limited to strikes against persons with whom the organization has a trade dispute; or to put it in another way, we are of opinion that a strike against A, with whom the strikers have no trade dispute, to compel A to force B to yield to the strikers' demands, is an unjustifiable interference with the right of A to pursue his calling as he thinks best. Only two cases to the contrary have come to our attention, namely: *Bohn Manuf. Co.* v. *Hollis,* 54 Minn. 223, and *Jeans Clothing Co.* v. *Watson,* 168 Mo. 133. The first of these two cases was overruled on this point in *Gray* v. *Building Trades Council,* 91 Minn. 171. The conclusion to which we have come is supported by *My Maryland Lodge* v. *Adt,* 100 Md. 238; *Gray* v. *Building Trades Council,* 91 Minn. 171; *Purington* v. *Hinchliff,* 219 Ill. 159; *Beck* v. *Railway Teamsters' Protective Union,* 118 Mich. 497; *Crump* v. *Commonwealth,* 84 Va. 927; *State* v. *Glidden,* 55 Conn. 46; *Purvis* v. *United Brotherhood of Carpenters,* 214 Penn. St. 348; *Gatzow* v. *Buening,* 106 Wis. 1; *Barr* v. *Essex Trades Council,* 8 Dick. 101; *Temperton* v. *Russell,* [1893] 1 Q. B. 715; Taft, J. in *Toledo, Ann Arbor & North Michigan Railway* v. *Pennsylvania Co.* 54 Fed. Rep. 730; *Loewe* v. *California State Federation of Labor,* 139 Fed. Rep. 71; *Hopkins* v. *Oxley Stave Co.* 83 Fed. Rep. 912; *Casey* v. *Cincinnati Typographical Union No. 3,* 45 Fed. Rep. 135.

It is settled in this Commonwealth by a long line of cases that a defendant is liable for an intentional and unjustifiable interference with the pursuit on the part of the plaintiff of his calling, whether it be of labor or business. *Walker* v. *Cronin,* 107 Mass. 555. *Carew* v. *Rutherford,* 106 Mass. 1. *Vegelahn* v. *Guntner,* 167 Mass. 92. *Plant* v. *Woods,* 176 Mass. 492. *Martell* v. *White,* 185 Mass. 255.

For the reason that the strike on the buildings being erected by the L. P. Soule and Son Company was not a strike in a trade dispute between the union and that corporation, the first and second clauses of the decree were in substance correct. Robert H. Pickett, however, is the only plaintiff. who is shown to have had any interest in the work on the Ford Building, and therefore the second clause of the decree alone should stand.*

---

* The material part of the decree was as follows:

"That the respondents in said bill, to wit: The Bricklayers Benevolent and

A few matters of detail remain to be dealt with.

All that the Bricklayers' Union No. 27 seems to have done was to adopt working rules making pointing a part of the trade of bricklaying. There is no evidence that they authorized the sending of the circular letter or took part in the strike. That union and the members of it should be stricken from the decree.

No objection has been taken to the decree in favor of Robert H. Pickett on the ground that damages would have given him adequate compensation for breach of his contract. For that reason it is not necessary to consider whether his proper remedy was an action at law for damages, as in *Carew* v. *Rutherford*, 106 Mass. 1, *Walker* v. *Cronin*, 107 Mass. 555, *Berry* v. *Donovan*, 188 Mass. 353, and *Quinn* v. *Leathem*, [1901] A. C. 495.

There is a point of practice which must be noticed. As we have said, the plaintiffs have undertaken to make three unincorporated labor unions parties defendant. That is an impossibility. There is no such entity known to the law as an unincorporated association, and consequently it cannot be made a party defendant. That was conceded in *Taff Vale Railway* v. *Amalgamated Society of Railway Servants*, [1901] A. C. 426. The point decided in that case was that the labor union defendant in that case could be sued because it was registered under Trades Union Acts 1871, c. 31, and 1876, c. 22. At law, if the objection is

Protective Unions No. 3 and No. 27, The Stone Masons Benevolent and Protective Union No. 9, and each and every member thereof, Jeremiah J. Driscoll, Patrick J. Walsh, Michael J. Shea, J. Cronan, Dennis J. Sullivan, George K. Watson, John P. Burke, J. M. Ryan, Theodore Eldracher, Joseph W. Luke and George J. Twiss, and each of them, their servants, agents, confederates and attorneys, be and hereby are perpetually restrained and enjoined from combining and conspiring in any way to compel L. P. Soule and Son Company, or any other person, firm or corporation, by force, threats, intimidation or coercion, to discharge the complainants in the bill of complaint, to wit: Robert H. Pickett, Charles A. Pickett, Thomas J. Lally and Walter H. Wilkins, or to refrain from further employing them in and about their trade and occupation, and from combining and conspiring to compel the owners of the so-called Ford Building on Ashburton Place in the city of Boston to break or decline to carry out their said contract with the complainant Robert H. Pickett, and from combining and conspiring to interfere with, the said complainants, or any of them, in the practice of their trade and occupation, or to prevent them from obtaining further employment.thereat."

properly taken, every member of an unincorporated association must be joined as a party defendant. In equity, if the members are numerous, a number of members may be made parties defendant as representatives of the class. The practice in Massachusetts in suits against members of unincorporated labor unions generally has been in accordance with these well settled principles. See *Bowen* v. *Matheson*, 14 Allen, 499; *Carew* v. *Rutherford*, 106 Mass. 1; *Plant* v. *Woods*, 176 Mass. 492; *Martell* v. *White*, 185 Mass. 255. A trade union was made a party defendant in *Vegelahn* v. *Guntner*, 167 Mass. 92, and the anomaly seems to have escaped attention. The judge who entered the decree in the case at bar made it apply to the unions "and each and every member thereof." He seems to have treated the case as a case where a numerous body had been properly represented by defendants joined for that purpose. Possibly, so far as the trial of the case was concerned, the members of these two unions were in fact represented by the individual defendants. But there is nothing on the record which justifies a decree against "each and every member" of the three unions on the ground that the defendants were joined as representing the individual members of the unions constituting a numerous class of defendants. The three unions should be stricken from the bill as parties defendant, and proper allegations should be made to bind the members of the two unions as parties defendant. If the individual defendants were proper representatives of the members of the unions in question, and these members would suffer no damage from the bill being so amended now, that can be done. The cases are collected in *Fay* v. *Walsh*, 190 Mass. 374.

Upon the bill being so amended within sixty days the decree may be modified as hereinbefore set forth, and on being so modified, affirmed; otherwise the decree must be reversed.

*So ordered.*

*F. W. Mansfield*, for the defendants.

*S. J. Elder & E. A. Whitman*, for the plaintiffs.