THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY *vs.* EDWARD F. JENKINS & others.

Suffolk.     February 2, 1954. — November 17, 1954.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & WILLIAMS, JJ.

*Labor and Labor Union. Jurisdiction,* Labor, Raising question of jurisdiction. *Unlawful Interference. Boycott. Equity Jurisdiction,* Damages, Labor. *Equity Pleading and Practice,* Labor case, Injunction, Parties, Damages. *Railroad,* Labor matters, Boycott. *Damages,* For unlawful interference. *Unincorporated Association.*

Neither the Federal national labor relations act, as amended by the labor management relations act, nor the Federal railway labor act precluded jurisdiction of the Massachusetts courts to entertain a suit by a railroad, not a party to any controversy between motor carriers and a union of operators of or helpers upon their vehicles, to enjoin a secondary boycott conducted in 1952 by the union against

the railroad by acts designed to prevent the railroad from transporting trailers of the motor carriers by rail in interstate commerce, which was a method of transportation impliedly permitted by the collective bargaining agreements between the motor carriers and the union. [726–732]

It is the duty of this court to decide a question of jurisdiction appearing on the record even though not raised by the parties. [728]

The fact that transportation of trailers of motor carriers by railroad would deprive union employees of the motor carriers of work which they otherwise would obtain would not justify the employees' union, whose collective bargaining agreements with the motor carriers impliedly permitted such transportation, in conducting a secondary boycott against the railroad, not a party to any controversy between the motor carriers and the union, by acts designed to prevent the railroad from furnishing such transportation to the motor carriers. [732]

Acts of a union of employees of motor carriers designed to prevent a railroad from transporting trailers of the motor carriers by rail, which transportation was impliedly permitted by collective bargaining agreements between the motor carriers and the union, were properly found to be an "unlawful secondary boycott" as against the railroad within subsection (f) added to G. L. (Ter. Ed.) c. 149, § 20C, by St. 1950, c. 452, § 2, where it appeared that the railroad was not a party to any controversy between the motor carriers and the union, that the transportation of the trailers was only a small part of the current business of the railroad, and that the work of loading and unloading the trailers onto and off the cars in the railroad yard done by employees of the railroad or of a subsidiary of the railroad would not have been done by the employees of the motor carriers in any case. [733]

An injunction against certain conduct of members of a labor union was not precluded by G. L. (Ter. Ed.) c. 214, § 9A, inserted by St. 1935, c. 407, § 4, as amended, for want of notice of the suit to the chief of police of the city in which such conduct occurred, where it appeared that there had been no violence or breach of the peace and that such notice was not necessary. [733–734]

In a class suit against numerous members of an unincorporated labor union represented by individuals named in the bill, only those members of the union who participated in or authorized or ratified certain wrongful conduct injuring the plaintiff should be ordered to pay damages, and a final decree ordering "the respondents" to pay the damages must be modified by substituting a provision ordering payment of the damages by two defendants against whom alone liability had been established. [734–735]

BILL IN EQUITY, filed in the Superior Court on July 15, 1952.

The suit was heard respecting a preliminary injunction by *Morton*, J., and on the merits by *Giles*, J.

*Stephen J. D'Arcy, Jr.,* for the defendants.

*Herbert Burstein* of New York, (*Edmund J. Moore &
William Q. Keenan* with him,) for the plaintiff.

RONAN, J.   These are appeals from certain interlocutory
decrees and from a final decree granting an injunction
restraining the three named individual defendants and
the other members of Local Union No. 25 of the Inter-
national Brotherhood of Teamsters, Chauffeurs, Warehouse-
men and Helpers of America from inducing or encouraging
any person to refuse to load trailers or threatening or hin-
dering any person or company from delivering trailers for
transportation upon the plaintiff's flat cars, from entering
the plaintiff's freight yard for said purpose, and from picket-
ing the said yard for the purpose of preventing the loading
or unloading of said trailers, and awarding damages to the
plaintiff.

Upon the filing of the bill a temporary restraining order
was issued ex parte and a preliminary injunction was granted
after a hearing following the return of the order of notice.
A single justice of this court, to whom the propriety of
granting the injunction was reported, refused to set aside
the injunction.   The suit was then heard on the merits in
the Superior Court upon oral evidence and, by agreement
of the parties, upon a transcript of the evidence adduced at
the hearing upon the return of the order of notice.   A final
decree followed granting injunctive relief and awarding
damages.

The appeal from the final decree is here upon a report of
the material facts and a transcript of the evidence, and
opens up for our determination questions of law, fact, and
discretion.   We can find for ourselves facts in addition to
those found by the trial judge and facts contrary to those
found by him if we are convinced that his findings are
plainly wrong.   *Trade Mutual Liability Ins. Co.* v. *Peters,*
291 Mass. 79.   *Lowell Bar Association* v. *Loeb,* 315 Mass.
176.   *291 Washington St. Inc.* v. *School St. Liquors, Inc.,*
*ante,* 150.

We now proceed to summarize briefly the facts.

The plaintiff is a railroad engaged in the carriage of passengers and the transportation of freight between places within and without the Commonwealth. It began in 1937 to transport trailers on flat cars between Boston and points outside the Commonwealth, principally to and from New York city. Trailers to be shipped from Boston were hauled into the plaintiff's Boston freight yard where they were detached from the tractors, left in the freight yard, and loaded upon the flat cars by employees of the New England Transportation Co. The business of transporting trailers to and from New York has steadily increased. The plaintiff has purchased 200 flat cars especially designed for this service and these, together with the construction of ramps and other necessary structures, represent an investment of more than $3,000,000. The total receipts from this service in 1951 amounted to about $1,000,000 which was less than one per cent of the total receipts derived by the plaintiff from the operation of its entire system.

Local No. 25 is a voluntary trade association or union, and the three named individual defendants occupy the offices ascribed to them in the bill and fairly represent the remaining members of the union. The union has about 9,000 members and is comprised of those who are employed as operators or helpers upon trucks or tractors of motor carriers doing business in Boston and engaged in the transportation of goods within and without the Commonwealth. It has collective bargaining agreements with these motor carriers. These carriers transport freight over the road between Boston and New York, but in recent time they have been making more use of the rail service furnished by the plaintiff. The union has viewed with alarm this increased rail service as it deprived its members of work they otherwise would have had of driving the tractors with the trailers over the highways. In recent years drafts of collective bargaining agreements containing provisions restricting the use of rail transportation were submitted to the motor carriers for execution at the expiration of existing agreements, but the carriers refused to sign and the union agreed

to the elimination of these provisions. The agreements were then executed. Agreements with the motor carriers in this form were in existence on the three days in July, 1952, hereinafter mentioned. Notwithstanding the attitude of the motor carriers in refusing to assent to a limitation of this rail transportation, representatives of the union conducted oral, collateral, and informal negotiations of uncertain content and doubtful import with some of the motor carriers seeking to restrict the use by the latter of the rail facilities furnished by the railroad. The union properly does not contend that such dealings resulted in any agreement of binding force and effect upon the motor carriers. They may have been undertaken by these representatives of the union to alleviate the tension within the union created by members who for some time had been insisting that rail transportation of trailers, commonly known in the transportation trade as "piggyback trucking," should be stopped or at least restricted. This subject was not included in the existing bargaining agreements, and we are satisfied that if the union desired a modification of the agreements it did not adopt the course outlined in the agreements to secure a modification. The relations between the motor carriers and the union concerning this mode of transportation had become unsteady and strained, but all parties were seemingly reluctant to force the issue. Finally on the late afternoons of July 11, 12, and 14, 1952, the defendants McCarthy and Norton, business agents of the union, took positions on the street near the entrance to the plaintiff's freight yard, stopped various tractors hauling trailers belonging to motor carriers who had collective bargaining agreements with the union, and ordered them to drive away from the freight yard, which the operators did. Some of the trailers of these motor carriers were already in the freight yard when McCarthy and Norton appeared, and were ready for loading, but they were not loaded because of the orders given by McCarthy and Norton to the employees of New England Transportation Co. These two union representatives were in the freight yard on one of these afternoons for a

short period of time carrying out their purpose of preventing the rail transportation of the trailers. Their conduct at no time was disorderly or other than peaceful. Although it did not appear that McCarthy and Norton were acting under any direct or specific instructions from the union, the union seeks to justify their conduct on the ground that they were acting in its behalf in attempting to make more work available for its membership if the rail transportation was prevented or restricted. The motor carriers are not parties to this suit.

The New England Transportation Co., a corporation, hereinafter called New England, is "a subsidiary" of the railroad. Nothing more definite of its relationship to the railroad appears. Trailers are left in the freight yard by the motor carriers and are loaded upon the flat cars by employees of New England and are fastened to the cars by employees of the mechanical department of the railroad. The reverse process is used on inbound trailers. The employees of New England are members of the union. New England has a collective bargaining agreement with the union, but it has no contract with the motor carriers.

## INJUNCTIVE RELIEF.

The parties in the present suit from the outset have recognized that the crucial question is the jurisdiction of the Superior Court to grant injunctive relief. Shortly before the bill of complaint was filed in the instant case, the United States District Court had dismissed, after an ex parte hearing, a bill filed by the railroad. The last amendment to the bill filed in the Superior Court was based upon *In re Washington-Oregon Shingle Weavers' District Council*, 101 N. L. R. B. 1159,[1] but we need not analyze that decision as we see nothing in it that tends to support the railroad's contention that the Superior Court had jurisdiction to restrain a violation of the secondary boycott provisions of the

[1] See *National Labor Relations Board* v. *Washington-Oregon Shingle Weavers' District Council*, 211 Fed. (2d) 149.

national labor relations act, § 8 (b) (4) (A), as amended by the labor management relations act, 1947, U. S. C. (1946 ed.) Sup. V, Title 29, § 158 (b) (4) (A). The railroad has now abandoned that contention but still contends that it is entitled to relief under the statutes and decisions of this Commonwealth.

One of the principal contentions of the union is that the subject matter of this suit comes within the exclusive jurisdiction of the national labor relations act of 1935, U. S. C. (1946 ed.) Title 29, § 151 et seq., as amended by the labor management relations act of 1947, U. S. C. (1946 ed.) Sup. V, Title 29, § 141 et seq., the Taft-Hartley act so called, hereinafter referred to as L. M. R. A. The union upon the facts found urges that it has engaged in a secondary boycott against the railroad in violation of § 158 (b) (4) (A) of said Title 29. The railroad was a neutral employer and so was New England. The union argues that L. M. R. A. has preempted the field and that there is no room for the operation of the laws of the Commonwealth to enjoin this secondary boycott. *Bethlehem Steel Co.* v. *New York State Labor Relations Board*, 330 U. S. 767. *La Crosse Telephone Corp.* v. *Wisconsin Employment Relations Board*, 336 U. S. 18. *Plankinton Packing Co.* v. *Wisconsin Employment Relations Board*, 338 U. S. 953. *International Union of United Automobile, etc. Workers of America, C. I. O.* v. *O'Brien*, 339 U. S. 454. *Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, Division 998* v. *Wisconsin Employment Relations Board*, 340 U. S. 383. *Montgomery Building & Construction Trade Council* v. *Ledbetter Erection Co. Inc.* 260 Ala. 382. *Gerry of California* v. *Superior Court of Los Angeles County*, 32 Cal. (2d) 119. *McNish* v. *American Brass Co.* 139 Conn. 44. *Norris Grain Co.* v. *Seafarers' International Union of North America, A. F. L., Canadian District*, 232 Minn. 91. *Pittsburgh Railways Co. Substation Operators & Maintenance Employees' Case*, 357 Pa. 379. The principle that a State court has no jurisdiction to restrain an unfair labor practice in the nature of a secondary boycott in an industry affecting commerce

has recently been affirmed by the Supreme Court of the United States. *Garner* v. *Teamsters, Chauffeurs & Helpers Local Union No. 776 (A. F. L.)*, 346 U. S. 485. *Building Trades Council* v. *Kinard Construction Co.* 346 U. S. 933. *Capital Service, Inc.* v. *National Labor Relations Board*, 347 U. S. 501.

In the next place, a bill of complaint brought for an injunction and based on a violation of § 158 (b) (4) (A) cannot be maintained by the railroad in its own behalf. It is settled that neither a Federal nor a State court has jurisdiction to restrain the commission of an unfair labor practice affecting commerce in proceedings begun in court by the injured party. *Amazon Cotton Mill Co.* v. *Textile Workers Union of America*, 167 Fed. (2d) 183. *Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America* v. *Dixie Motor Coach Corp.* 170 Fed. (2d) 902. *Schatte* v. *International Alliance of Theatrical Stage Employees & Moving Picture Machine Operators of United States & Canada*, 182 Fed. (2d) 158. *Studio Carpenters Local Union No. 946* v. *Loew's, Inc.* 182 Fed. (2d) 168, certiorari denied 340 U. S. 828.

We are not, however, prepared to agree with the union that the only means open to the railroad to secure injunctive relief was through a charge filed by the railroad with the national labor relations board and by subsequent proceedings by the board. In *International Rice Milling Co. Inc.* 84 N. L. R. B. 360, the board held that it would not entertain a charge by a railroad that a union had been guilty of an unfair labor practice in the nature of a secondary boycott, pointing out that L. M. R. A., in (2) and (3) of Title 29, § 152, provides that the term "employer" should not include "any person subject to the Railway Labor Act" and that the term "employee" should not include any individual "employed by an employer subject to the Railway Labor Act." When the case came before the Circuit Court of Appeals, *International Rice Milling Co. Inc.* v. *National Labor Relations Board*, 183 Fed. (2d) 21, 25, it was stated that railroads were not excepted from protection under

L. M. R. A. from a secondary boycott as defined in said § 158 (b) (4) (A). The board did not seek a review upon this point and consequently the question was not decided on the appeal to the Supreme Court of the United States, *National Labor Relations Board* v. *International Rice Milling Co. Inc.* 341 U. S. 665, but on remand the board issued a cease and desist order apparently accepting the position of the Court of Appeals that railroads were employers within § 158 (b) (4) (A). See 95 N. L. R. B. 1420. It is to be noted, however, that the board has expressly declined to follow the broad interpretation made by the Court of Appeals in determining the scope of the exemption set forth in said § 152 (2), (3), although the matter then before the board did not concern a railroad. *Sprys Electric Co.* 104 N. L. R. B. 1128. See also *Al J. Schneider Co. Inc.* 87 N. L. R. B. 99; *Texas Electric Bus Lines,* 100 N. L. R. B. 67; *Roy Stone Transfer Corp.* 100 N. L. R. B. 856. The board seems to have taken the position that, if the party affected is not an employer within said § 152 (2), it will not entertain any charge filed with it. In this situation, until we are more positively directed to the contrary, we doubt that the railroad could obtain a remedy by filing a charge under L. M. R. A. See *Pacific Gamble Robinson Co.* v. *Minneapolis & St. Louis Railway,* 105 Fed. Sup. 794, 804; *Minneapolis & St. Louis Railway* v. *Pacific Gamble Robinson Co.* 181 Fed. (2d) 812.

We next inquire whether our courts lack jurisdiction to grant an injunction by reason of U. S. C. (1946 ed.) Title 45, § 151 et seq., the railway labor act. It is the duty of the court to decide its jurisdiction when the question appears on the record even though the point has not been raised by the parties. *Jones* v. *Jones,* 297 Mass. 198. *Blair* v. *Boston Elevated Railway,* 310 Mass. 1. *Couto* v. *Trustees of New York, New Haven & Hartford Railroad,* 312 Mass. 23.

The history and purpose of this act are fully set forth in *General Committee of Adjustment of the Brotherhood of Locomotive Engineers for the Missouri-Kansas-Texas Railroad* v. *Missouri-Kansas-Texas Railroad,* 320 U. S. 323, 328–333,

and in *Elgin, Joliet & Eastern Railway* v. *Burley*, 325 U. S. 711, 751–754, *S. C.* 327 U. S. 661, 676–677. What was there said need not be here repeated. The railway labor act applies to disputes between an interstate railroad and its employees arising out of the employer-employee relationship. It sets up nonjudicial processes of conciliation, mediation, and arbitration if negotiation fails for the adjustment of disputes rather than affording immediate recourse to the courts leaving "a minimum responsibility to the courts." *Order of Railway Conductors of America* v. *Pitney*, 326 U. S. 561, 566. Differences arising out of collective bargaining agreements must be left to the determination of the administrative agency provided by the act and not to the decision of a State court. *Slocum* v. *Delaware, Lackawanna & Western Railroad*, 339 U. S. 239. *Order of Railway Conductors of America* v. *Southern Railway*, 339 U. S. 255. *Brennan* v. *Delaware, Lackawanna & Western Railroad*, 303 N. Y. 411. There are two well established exceptions to the broad jurisdiction conferred upon an adjustment board by the act, U. S. C. (1946 ed.) Title 45, § 153 (i), to interpret collective bargaining agreements and to settle grievances and disputes arising therefrom: First, an employee instead of seeking relief under the act may bring an action for his wrongful discharge provided his employment has been finally terminated and he is not seeking reinstatement, the determination of his seniority rights, or other benefits, *Moore* v. *Illinois Central Railroad*, 312 U. S. 630; and, second, Federal courts have entertained suits at the instance of an employee where collective bargaining agreements have been challenged as invalid, usually in cases where the agreement is shown to be discriminatory by reason of the color of some of the employees who, unless permitted to maintain a bill in equity to protect their rights, would be without a remedy. *Steele* v. *Louisville & Nashville Railroad*, 323 U. S. 192. *Graham* v. *Brotherhood of Locomotive Firemen & Enginemen*, 338 U. S. 232. *Brotherhood of Railroad Trainmen* v. *Howard*, 343 U. S. 768.

But does the instant suit come within this broad sweep of

the railway labor act? Neither the railroad nor New England was a party to any controversy between the union and the motor carriers. There was no dispute between New England and its employees as to wages, hours, or working conditions. It is plain that pressure was brought upon the employees of New England solely for the purpose of preventing the transportation of the trailers by the railroad or, in other words, to compel the railroad to cease doing business with the motor carriers. This was the maintenance of a secondary boycott against the railroad — a weapon long banned in industrial struggles. *New England Cement Gun Co.* v. *McGivern,* 218 Mass. 198, 203. *Cornellier* v. *Haverhill Shoe Manufacturers' Association,* 221 Mass. 554, 559. *Harvey* v. *Chapman,* 226 Mass. 191, 195. *W. A. Snow Iron Works, Inc.* v. *Chadwick,* 227 Mass. 382, 389. *Martineau* v. *Foley,* 231 Mass. 220, 223. *Armstrong Cork & Insulation Co.* v. *Walsh,* 276 Mass. 263, 272. *Reeves* v. *Scott,* 324 Mass. 594, 601.

All parties agree that there was no dispute between the railroad and the union, and the case was presented and tried upon that basis. The union has no concern in the labor policy of the railroad and does not seek to change that policy but is attempting to eliminate or restrict competition by the railroad. The railroad itself has no contract with the union. It has no contract with the motor carriers. It merely accepts the trailers as they are offered for shipment in accordance with its obligations as a common carrier and at the rates established by the interstate commerce commission. A railroad not a participant in a dispute between a union and a shipper has frequently been granted an injunction against striking employees at a plant restraining them from interfering with the movement of freight cars to and from the employer's premises. Likewise, a railroad has been held liable for failure to furnish and remove cars as required by an employer whose employees were conducting a strike against him. *Illinois Central Railroad* v. *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Union Local 568,* 90

Fed. Sup. 640. *Louisville & Nashville Railroad* v. *Local Union No. 432 of International Woodworkers of America*, 104 Fed. Sup. 748. *Erie Railroad* v. *Local 1286, International Longshoremen's Association*, 117 Fed. Sup. 157. See also *Northwestern Pacific Railroad* v. *Lumber & Sawmill Workers' Union*, 31 Cal. (2d) 441; *Burlington Transportation Co.* v. *Hathaway*, 234 Iowa, 135; *General Drivers, Warehousemen & Helpers, Local Union No. 89* v. *American Tobacco Co. Inc.*, Ky., 264 S. W. (2d) 250. There are, however, decisions which do not recognize any absolute duty of the common carrier to receive and transport goods excusable only by acts of God or public enemies but are predicated only upon the duty of the carrier to exercise due diligence, as in *Gage* v. *Arkansas Central Railroad*, 160 Ark. 402, *Ritchie* v. *Oregon Short Line Railroad*, 42 Idaho, 193, and *Murphy Hardware Co.* v. *Southern Railway*, 150 N. C. 703, where delays may be excused because of strikes. See *National Labor Relations Board* v. *Rockaway News Supply Co. Inc.* 345 U. S. 71. The railroad's claim for damages rests principally upon the activity of McCarthy and Norton preventing the hauling of the trailers into the freight yard although in a few instances it seems that trailers had been left in the yard and accepted for shipment by the railroad and had been ordered by them to be removed from the yard. Of course, the railroad could not be held liable for damages from the failure to ship trailers that had not been delivered to it. It appears to us that the gist of the union's complaint is against a method of transportation employed by the motor carriers which none of the collective bargaining agreements with the carriers or New England prohibited but which they impliedly permitted as shown by the circumstances attending the making of these agreements, and that the union had no right to bring pressure upon the railroad through New England to compel the railroad to cease transporting trailers for the motor carriers. See *Opera on Tour, Inc.* v. *Weber*, 285 N. Y. 348, certiorari denied sub nomine *Weber* v. *Opera on Tour, Inc.* 314 U. S. 615. We do not think in these circumstances that the

railway labor act bars the railroad from resorting to the State court for injunctive relief.

The union seeks to justify its interference with the business of the railroad on the ground that the transportation by rail deprives its members of work which they otherwise would obtain. A union has the right to refuse to work for an employer unless he gives them all of his work which its members are competent to perform, *Pickett* v. *Walsh,* 192 Mass. 572; but it has no right against a third party to compel him to cease doing business with the employer and thus compel the latter to give all his work to the union. *Reeves* v. *Scott,* 324 Mass. 594. The union could not accomplish such an object against the motor carriers by means of a secondary boycott against New England or the railroad. The burden of showing that its conduct was justified in preventing the loading of the trailers already in the freight yard and in prohibiting other trailers from entering the freight yard has not been sustained by the union. *Quinton's Market, Inc.* v. *Patterson,* 303 Mass. 315, 317. *Keegan* v. *O'Donnell,* 310 Mass. 346, 349–350. Likewise, the right to picket at the entrance to the plaintiff's freight yard fails when it is utilized as a means of maintaining an unlawful secondary boycott. *Simon* v. *Schwachman,* 301 Mass. 573, 577. *R. H. White Co.* v. *Murphy,* 310 Mass. 510, 522. *Fashioncraft, Inc.* v. *Halpern,* 313 Mass. 385, 391. *Colonial Press Inc.* v. *Ellis,* 321 Mass. 495, 501. *National Labor Relations Board* v. *Denver Building & Construction Trades Council,* 341 U. S. 675. *International Brotherhood of Electrical Workers* v. *National Labor Relations Board,* 341 U. S. 694. *Local 74, United Brotherhood of Carpenters & Joiners of America, A. F. of L.* v. *National Labor Relations Board,* 341 U. S. 707.

The final question on this branch of the case is whether our courts had jurisdiction to grant an injunction. The union contends that this suit comes within G. L. (Ter. Ed.) c. 149, § 20C, inserted by St. 1935, c. 407, § 1, as amended by St. 1950, c. 452, §§ 1, 2, and further that no injunction could be granted as the conditions precedent prescribed by

G. L. (Ter. Ed.) c. 214, § 9A, inserted by St. 1935, c. 407, § 4, as amended by St. 1950, c. 452, § 3, for its issuance were not found by the trial judge.

It is true that the judge found that the suit did not involve a labor dispute as defined by said § 20C, as amended, but it is true that he also found that, if there was a labor dispute, "the union was guilty of an unlawful secondary boycott." We have already said that the finding of the maintenance of a boycott was not plainly wrong and therefore must stand. The finding also complies with the term "unlawful secondary boycott" as defined by said § 20C (f)[1] and is not removed from its sweep because it has also been found that the transportation of the trailers for motor carriers who had bargaining agreements with the union was not the greater part of the current business of the railroad and that the loading of the trailers would not have been done by the motor carriers if there had been no dispute between them and the union.

The trial judge also made the specific findings required by said § 9A, as amended, before entering the final decree. The only contention of the union in this respect is that there was no proof that notice of the suit had been given to "the chief of the police of the city of Boston" by serving him with a copy of the bill of complaint as alleged in the amended bill which averred, and the answer admitted, that there was no violence or breach of the peace. The short answer to this contention is that in the circumstances notice to the head of the police department was not necessary for the

---

[1] "The term 'unlawful secondary boycott' means any strike, slowdown, boycott, or concerted cessation of work or withholding of patronage or services, arising out of a labor dispute, where an object thereof is to force or require any person not otherwise engaged in such labor dispute to cease using, selling, handling, transporting, or dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; provided, however, that a secondary boycott may lawfully be directed at a person the greater part of whose current business over a representative period is processing, selling, handling, transporting or otherwise dealing in the goods of an employer primarily interested in a lawful labor dispute or who, by any agreement, understanding or arrangement with such employer, is requiring his own employees to perform work or services which would be done by the employees of such employer in the absence of a labor dispute."

entry of the final decree. The point is settled by *Davis Brothers Fisheries Co. Inc.* v. *Pimentel,* 322 Mass. 499, 509.

## DAMAGES.

A person injured in his business or property by an unlawful secondary boycott may ordinarily bring an action at law for damages. His right to damages, for instance, is not foreclosed by L. M. R. A. for it is there expressly provided that he has such a right to damages sustained by a secondary boycott, U. S. C. (1946 ed.) Sup. V, Title 29, § 185 (b), and it has been held that the enforcement of that right is not dependent on any prior determination of the national labor relations board. *International Longshoremen's & Warehousemen's Union* v. *Juneau Spruce Corp.* 342 U. S. 237. See *United Construction Workers* v. *Laburnum Construction Corp.* 347 U. S. 656. Even where the right to an injunction is lost, it was said in *Brotherhood of Railroad Trainmen* v. *Toledo, Peoria & Western Railroad,* 321 U. S. 50, 63, that the railroad was not without a remedy for it could bring an action for damages. Where relief by injunction was no longer necessary in a labor controversy, as in *Quinton's Market, Inc.* v. *Patterson,* 303 Mass. 315, 321, we remanded the case for the assessment of damages. We merely mention these decisions to illustrate the relationship between the remedy by injunction and the remedy by an award of damages in cases arising out of labor controversies. Where a plaintiff is permitted to seek an injunction he may, as he usually does, also seek damages.

The final decree without any further specification ordered "the respondents" to pay $4,727. This is a class suit in which all the members of the union were represented by the individuals named in the bill, *Thorn* v. *Foy,* 328 Mass. 337, 338; but the union under our law is not a legal entity, *Members of Bakery & Confectionery Workers International Union* v. *Hall Baking Co.* 320 Mass. 286, 291–292, and only those members who participated in or authorized or ratified the wrong complained of should be ordered by name to pay

compensation. Liability has been established only as to McCarthy and Norton. *Sweetman* v. *Barrows*, 263 Mass. 349, 355. *Malloy* v. *Carroll*, 287 Mass. 376, 392. *Sullivan* v. *Barrows*, 303 Mass. 197, 204. *Quinton's Market, Inc.* v. *Patterson*, 303 Mass. 315, 320–321.

CONCLUSION.

The interlocutory decrees granting the temporary restraining order and the preliminary injunction must be affirmed in view of the order which we now make affirming the final decree covering such matters. The denial of the motion to dissolve the temporary restraining order, the denial of the requests for rulings, and the overruling of the demurrer to the bill subsequently amended and other miscellaneous matters need not be specifically discussed for various reasons. *Boston* v. *Dolan*, 298 Mass. 346, 355–356. *Restighini* v. *Hanagan*, 302 Mass. 151, 154. *Revere* v. *Blaustein*, 315 Mass. 93. *Commonwealth* v. *Gale*, 317 Mass. 274, 277. *Banks* v. *Election Commissioners of Boston*, 327 Mass. 509, 514. The final decree, however, must be modified by striking out the last sentence ordering "the respondents" to pay and substituting therefor a provision ordering McCarthy and Norton to pay the sum of $4,727, together with interest from the date of the filing of the bill and costs of this appeal, and as modified is affirmed.

*So ordered.*